**AIR PRODUCTS & CHEMICALS, INC., et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 78–2011.

United States Court of Appeals, Fifth Circuit.

July 16, 1981.

Frederick Moring, Dana Contratto, Roscoe C. Howard, Jr., Crowell & Moring, Jones, Day, Reavis & Pogue, Washington, D.C., for Associated Gas Distributors.

Peter H. Schiff, Gen. Counsel, Public Service Commission of N.Y., Albany, N.Y., Dennis Lane, Richard A. Solomon, Barry A. Friedman, Wilner & Scheiner, Washington, D.C., for Public Service Commission for the State of New York.

Robert R. Nordhaus, Gen. Counsel, Jerome M. Feit, Deputy Sol., George H. Williams, Jr., Barry J. Sheingold, Attys., Washington, D.C., for respondent Federal Energy Regulatory Commission.

James R. Patton, Jr., David B. Robinson, Duane A. Siler, Linda Elizabeth Buck, Patton, Boggs & Blow, Washington, D.C., Harry E. Barsh, Jr., Camp, Carmouche, Palmer, Barsh & Hunter, Washington, D.C., for the State of Louisiana.

Irving Jacob Golub, Stephen M. Hackerman, Nancy Rice, Houston, Tex., Walter W. Kurczewski, Chicago, Ill., for Estech General Chemicals Corp.; Baker & Botts, Houston, Tex., of counsel.

Vernon M. Turner, Michael B. Silva, Tenneco Oil Co., Houston, Tex., Gordon Gooch, Bruce F. Kiely, Kirk K. Van Tine, Baker & Botts, Washington, D.C., for Tenneco Oil Co.

Edward H. Gerstenfield, Jones & Gerstenfield, P.A., Bethesda, Md., for First Mississippi Corp.; Alfred L. Price, Jackson, Miss., of counsel.

Justin R. Wolf, Charles H. Shoneman, George H. Rothchild, Jr., Washington, D.C., for Placid Oil Co. and Hunt Petroleum Corporation, Hunt Oil Company, Hunt Industries; Paul W. Hicks, Dallas, Tex., Robert W. Henderson, Dallas, Tex., of counsel.

Eric A. Eisen, Jerome Ackerman, Nicholas W. Fels, Covington & Burling, Washington, D.C., for Air Products & Chemicals, Inc.

Joseph C. Johnson, Thomas H. Burton, Carolyn S. Hazel, Houston Tex., for Continental Oil Co.

Platt W. Davis, III, Vinson & Elkins, Washington, D.C., J. Evans Attwell, Vinson & Elkins, Houston, Tex., for TransOcean Oil Co.

Harold L. Talisman, Peter L. Hatton, Littman, Richter, Wright & Talisman, Washington, D.C., for Tennessee Gas Pipeline Co., a Division of Tenneco, Inc.

Thomas G. Johnson, Houston, Tex., for Shell Oil Co.

William T. Miller, Miller, Balis & O'Neil, P.C., Charles F. Wheatley, Jr., Washington, D.C., for Municipal Distributors Groups.

Irving Jacob Golub, Stephen M. Hackerman, Baker & Botts, Houston, Tex. for Swift Agricultural Chemicals Corp.

Richard F. Generelly, Shannon & Morley, Washington, D.C., W. O. Strong, III, Houston, Tex., for Ashland Oil, Inc.

Joseph H. Moss, Jr., Birmingham, Ala., for Southern Natural Gas Co.

Lauren Eaton, Houston, Tex., for Gulf Oil Corp.

Before HENDERSON, ANDERSON and SAM D. JOHNSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

Producers of offshore federal domain natural gas, customers of these producers, pipeline companies serving the offshore federal domain,[1] and the State of Louisiana ("producer petitioners" or "producers") join in petitioning this court to review orders of the Federal Energy Regulatory Commission ("FERC") denying certificates of public convenience and necessity for the transportation of natural gas in the offshore federal domain reserved by producers for their own use, for use by affiliated companies, or for direct sale to specified customers. These producer petitioners raise a wide variety of attacks against the FERC's orders. Because we conclude that a procedural error by the FERC vitiates the major finding underlying its decision, we vacate the decision and remand for further consideration.

The Public Service Commission of the State of New York and the Associated Gas Distributors ("consumer petitioners")[2] also petition this court, claiming that the FERC failed to consider their request that the producer petitioners be ordered to make gas paybacks or monetary reimbursements to interstate pipelines for offshore federal domain gas transported before the orders on review for the producers' own use or direct sale to specified customers. We agree that the FERC failed to adequately address this request. On remand, the FERC shall either address this request in the orders now on review or make provision to address this question in another proceeding.

## FACTS AND PROCEDURAL BACKGROUND

In 1974 and 1975, several producers and interstate pipeline companies filed separate applications with the Federal Power Commission ("FPC") for certificates of public convenience and necessity to authorize transportation of natural gas produced in the offshore federal domain. While each application involved its own unique factual situation, the basic pattern of each transaction was an agreement by the producers to sell a portion of the offshore federal domain gas to the pipelines and an agreement by the pipelines to transport the remaining portion of the gas reserved for the producer's own use, for use by a company affiliated with the producer, or for direct sale to a specified industrial user. The bulk of the producer-reserved gas was to be used in the manufacture of anhydrous ammonia, an essential ingredient in nitrogen fertilizer. The remaining portion of the producer-reserved gas was earmarked for a synthetic rubber plant, two refineries, and a liquid hydrogen plant supplying the National Aeronautics and Space Administration.[3] The FPC ordered consolidated proceedings for these applications in light of the common request for producer reservation of a portion of offshore federal domain gas.

1. The producer petitioners, grouped according to their briefs, are: (1) TransOcean Oil, Inc. ("TransOcean") and Estech General Chemicals Corporation ("Estech General"); (2) First Mississippi Corporation ("First Mississippi"), Placid Oil Company, Hunt Petroleum Corporation, Hunt Oil Company, and Hunt Industries; (3) Tenneco Oil Company ("Tenneco"); and (4) Air Products and Chemicals, Inc. ("Air Products").

2. The consumer petitioners have intervened in support of the FERC on the issues raised by the producer petitioners. Air Products and Tenneco have intervened in support of the FERC on the issue raised by the consumer petitioners.

3. The applicants to the FPC, not all of whom are petitioners to this court, and the proposed use of their reserved gas are as follows:

| PRODUCER | RESERVED INTEREST |
|---|---|
| Placid Group | |
| Placid Oil Co.<br>Hunt Petroleum Corp.<br>Hunt Industries<br>Hamilton Bros. Oil<br>Hamilton Exp.<br>Hunt Oil | Reserved Gas to be supplied to Ampro Plant, anhydrous ammonia plant, owned 75% by Placid Group and 25% by First Mississippi Corp. |
| TransOcean Oil, Inc. | Reserved for use in anhydrous ammonia plant owned by corporate affiliate, Estech General Chemicals Corp. (formerly Swift Agricultural Chemicals Corporation). |
| Tenneco Oil Company | Reserved for use in Tenneco's Chalmette Refinery, and for sale to Air Products and Chemicals, Inc., for use in anhydrous ammonia plant and liquid hydrogen plant |

A hearing in the consolidated proceedings was convened before an Administrative Law Judge ("ALJ"). Following development of a record containing extensive testimonial and documentary evidence, the ALJ issued a Decision and Order, dated December 2, 1975 ("Initial Decision"). The ALJ, relying largely upon three grounds, granted the certificates substantially as requested. First, the ALJ found that the certificates should be granted pursuant to the incentive policy established in *In re Chandeleur Pipe Line Co.*[4] The *Chandeleur* incentive was a policy of allowing producers to reserve portions of offshore federal domain gas even for relatively low priority uses such as boiler fuel in refineries in an attempt to encourage development of the offshore federal domain. Second, the ALJ found that the end use of natural gas in the production of anhydrous ammonia and liquid hydrogen constituted a high priority use. Third, with respect to the use of gas in Tenneco's Chalmette Refinery, the ALJ acknowledged that such use was low priority, but found nevertheless that a specified and limited use was justified as the most efficient means of production.

On March 7, 1977, the FPC issued Opinion No. 789 affirming the ALJ's orders, but on modified reasoning. The FPC noted that the *Chandeleur* incentive had been established, and had been applied, in cases requesting the reserve of offshore federal domain gas for use in refineries. Although refineries typically do not make a high priority use of natural gas, the need for an incentive to spur development in the offshore federal domain had been perceived in *Chandeleur* and its progeny as sufficient reason to grant producer reservation. In the instant case, the FPC held that the

*Chandeleur* incentive was no longer necessary to encourage the further development of offshore federal domain natural gas reserves. Accordingly, the FPC expressly terminated the *Chandeleur* incentive policy, holding that the policy of encouraging development in the offshore federal domain would no longer provide grounds for producer-reservation. Having eliminated the *Chandeleur* incentive for justifying producer reservation, the FPC relied upon what the producer petitioners describe as an "end product" rationale with respect to the applications proposing to utilize the gas in the production of anhydrous ammonia. The FPC found from a review of the record that long-term projections predicted a shortage of nitrogen fertilizer. Because the FPC found that the use of nitrogen fertilizers was essential to this country's food and plant-based fiber production, it found that use of the offshore federal domain gas for the manufacture of anhydrous ammonia was in the public interest. The FPC also relied upon what may be called an "end use" rationale to justify granting certificates to transport producer-reserved gas. The FPC noted that in the production of anhydrous ammonia and liquid hydrogen, natural gas is used for feedstock and process heat purposes.[5] These uses are high priority uses, and the FPC concluded it was in the public interest to allow producer-reservations for these uses. The FPC acknowledged that curtailments on the interstate pipe line system were increasing, but noted that some of the gas in the interstate system was utilized for inferior uses. It also noted the interstate system was adding new customers daily. The FPC concluded that the curtailment levels in the interstate market were not sufficient at that time to require the denial of producer reservation

---

4. *In re Chandeleur Pipe Line Co.*, 42 F.P.C. 20 (1969), *remanded, Public Service Commission of the State of New York v. FPC*, 436 F.2d 904 (D.C. Cir. 1970), *reconsidered, In re Chandeleur Pipe Line Co.*, 44 F.P.C. 1747 (1970), *aff'd. Public Service Commission of the State of New York v. FPC*, 463 F.2d 824 (D.C. Cir. 1974).

5. The FERC's regulations define "feedstock gas" and "process gas" as follows:

(7) *Feedstock gas.* Is defined as natural gas used as raw material for its chemical properties in creating an end product.

(8) *Process gas.* Is defined as gas use for which alternate fuels are not technically feasible such as in applications requiring precise temperature controls and precise flame characteristics. For the purpose of this definition propane and other gaseous fuels shall not be considered alternate fuels.

18 C.F.R. § 2.78(c)(7) and (8) (1980).

of natural gas for utilization as feedstock and for process heat.

Several parties applied for rehearing of Opinion No. 789, and the FPC granted these petitions. Shortly after the petitions for rehearing had been granted, the FPC ceased to exist and its functions and regulatory responsibilities were transferred to the Secretary of Energy and the FERC, effective October 1, 1977.[6]

On March 20, 1978, the FERC issued Opinion No. 10, reconsidering the FPC's Opinion No. 789. The FERC reversed the bulk of Opinion No. 789, denying the producer petitioners certificates to transport producer-reserved offshore federal domain gas. The FERC made this reversal without further hearing or the introduction of new evidence. In Opinion No. 10, the FERC devoted substantial effort to an extensive review of producer reservation policy as enunciated in Opinion No. 789. The FERC first reaffirmed the view expressed in Opinion No. 789 that the *Chandeleur* incentive was no longer needed as a spur to development of the federal offshore domain and should be terminated. The FERC then turned to what it called the "'end use' adaptation of the *Chandeleur* incentive doctrine" relied upon in Opinion No. 789 to support producer reservation. The FERC gave four reasons why it believed any policy of producer reservation, no matter the rationale, should be terminated and why the "end use" rationale utilized in Opinion No. 789 did not justify producer reservation. We discuss these four reasons in the next part of this opinion. In stating these reasons, the FERC indicated it took notice of various reports on current curtailments and supplies in the interstate market within its files. After concluding that it would no longer continue a policy of producer-reservation, the FERC turned to the individual applications for certificates. The FERC made findings with respect to each applicant's particular situation—noting that the producers were involved in the active exploration of gas onshore as well as offshore, that many of the producers were active sellers of gas in the intrastate market, and that exploration onshore might supply all the needs of the plants in question—and rejected each application.

Several aggrieved parties filed applications for rehearing of Opinion No. 10 pursuant to § 19(a) of the Natural Gas Act. On June 21, 1978, the FERC issued its Opinion No. 10–A, reviewing and affirming all pertinent aspects of Opinion No. 10.

## REASONS FOR ENDING POLICY OF PRODUCER–RESERVATION

As noted, the FERC in Opinion Nos. 10 and 10–A reiterated the holding in Opinion No. 789 that the *Chandeleur* incentive would no longer constitute a reason for allowing producer reservations.[7] The principal thrust of Opinion Nos. 10 and 10–A was devoted to an explanation of its decision to abandon the "end use" adaptation of the *Chandeleur* incentive utilized in Opinion No. 789 to allow producer reservation.[8] It

6. Department of Energy Organization Act (DEO Act), Pub.L. 95–91, 91 Stat. 565 (Aug. 4, 1977), 42 U.S.C.A. § 7101 *et seq.* (West Supp. 1981), and Executive Order No. 12009, 42 F.R. 46267 (Sept. 15, 1977).

The "savings provisions" of § 705(b) of the DEO Act, 42 U.S.C.A. § 7295(b), provided that proceedings pending before the FPC on the Act's effective date shall not be affected and that orders shall be issued in such proceedings as if the Act had not been enacted. The functions which are the subject of these petitions were specifically transferred to the FERC by § 402(a)(1) and (2) of the DEO Act, 42 U.S.C.A. § 7172(a).

7. No petitioner seriously attacks the FERC's conclusion to terminate the *Chandeleur* incen-

tive. Insofar as any petitioner does attack this termination, the reasons given by the FERC as to why the "end use" adaptation is no longer viable are broad enough to provide adequate explanations for abandoning the original *Chandeleur* incentive. Furthermore, the *Chandeleur* incentive was an experimental policy repeatedly attacked by consumer interests. *See In re Chandeleur Pipe Line Co.*, 44 F.P.C. 1747 (1970), *aff'd Public Service Commission of State of New York v. F. P. C.*, 463 F.2d 824; *Tennessee Gas Pipeline Company*, 53 F.P.C. 1206 (1975); *Mobil Oil Corp.*, 54 F.P.C. 1049 (1975).

8. Several petitioners suggest that because the FERC labeled the reasoning of Opinion No. 789 as the "'end use' adaptation of the *Chandeleur*

gave four reasons why it would no longer allow producer reservations, describing these reasons broadly as (i) the impact of producer reservation on the interstate gas supply, (ii) antitrust considerations, (iii) conflict with prior FERC and FPC opinions, and (iv) price advantages. We discuss each of these reasons.

### (i) Impact on producer reservations on interstate gas supply.

The producer petitioners all maintain that the primary rationale for the FERC's decision was its finding that the interstate market was suffering serious curtailments which were projected to become worse. The FERC reasoned that it could not allow a policy of producer reservation to continue which would have the effect of diverting gas from the interstate market to the intrastate market. While the FERC acknowledged that denial of the requested certificates was not the same as requiring production and sale to the interstate markets, it noted that, with its veto power over transportation through interstate pipelines, "[t]ime, and the Secretary of Interior would [require production and sale to the interstate market]." (Opinion No. 10, p. 17.) The producer petitioners challenge the FERC's conclusions on the impact on the interstate market on two grounds: (a) there is no substantial evidence in the record supporting the FERC's findings, and (b) the FERC took official notice of evidence without affording the producers an opportunity for rebuttal.

### (a) Substantial evidence.

■ The parties agree that the FERC's findings are to be tested under the "substantial evidence" test. The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *Refrigerated Transport Co. v. ICC*, 616 F.2d 748 (5th Cir. 1980). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. FMC*, 383 U.S. at 620, 86 S.Ct. at 1026. Moreover, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

■ The producer petitioners object that the record evidence which relates to curtailments in the interstate markets up to 1975,[9] does not satisfy the "substantial evidence" requirement. Our review of the record indicates that the record evidence was more than substantial to support a finding of serious and deepening curtailment as of 1975.[10]

■ The producer petitioners also maintain that the finding of serious and deepen-

---

incentive doctrine," that it was attempting to establish the reasoning of Opinion No. 789 as a "straw man" to be rejected merely by reiterating the rejection of the original *Chandeleur* incentive doctrine. The pains to which the FERC went to explain why it no longer would allow producer reservations belies this characterization of the FERC's reasoning.

**9.** The FERC in Opinion No. 10 took official notice of the curtailment situation in interstate pipelines after 1975. The producer petitioners object to this official notice and we discuss this issue immediately below. *See, infra,* pp. 696–700.

**10.** William Rogers testified that Tennessee Gas Pipeline Company, a Division of Tenneco, Inc.,

expected curtailment into Category 2 to be no better in the winter of 1975–76 than in the prior winter. (Joint Appendix ("J.A."), pp. 2–3).

J. T. Kennedy testified that Trunkline had been experiencing increasing curtailments since November, 1971, as a result of a decline in contracted gas supplies, that the situation was deteriorating, and that Trunkline was curtailing an equivalent of Category 1 customers in the winter. (J.A., pp. 5–7, and 11–14).

In prepared testimony, Charles H. Frazier indicated the interstate market would still be short of supply with all the offshore federal domain gas involved and that further shortfall may be predicted. (J.A., p. 116).

ing curtailment in the interstate market is flawed by the FERC's failure to give consideration to alleged contrary findings by the ALJ in his Initial Decision and the FPC in Opinion No. 789. They correctly note that in determining what in the record fairly detracts from an agency's findings, a reviewing court must consider any contrary findings by an examiner. *Universal Camera Corp. v. NLRB, supra; Greater Boston Television Corp. v. FCC,* 444 F.2d 841 (D.C. Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Nothing in the ALJ's Initial Decision nor in the findings of the FPC in Opinion No. 789 detract from the FERC's findings on curtailment. Indeed, Opinion No. 789 found that curtailments in the interstate system were becoming worse. (Opinion No. 789, J.A. 408). It concluded, however, that the situation was not so severe as to bar a producer reservation for feedstock and process purposes. (*Id.*) There was no change in the factual findings from Opinion No. 789 to Opinion No. 10. Instead, there was a change only in the judgment as to what policy those findings dictated. This policy change is precisely the type of change a rehearing is meant to afford.

(b) Reliance on Nonrecord Evidence.

■ All producer petitioners maintain that the FERC improperly relied upon extra-record evidence to support its finding that the interstate market faced serious and deepening curtailments. They allege a violation by the FERC of § 556(e) of the APA, 5 U.S.C.A. § 556(e) (West 1977), in relying on non-record evidence.[11] Section 556(e) of the APA reads in pertinent part:

When an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary.

The FERC does not question the applicability of § 556(e) of the APA to this proceeding. Accordingly, we evaluate the producer petitioners' arguments under the standards developed under this provision, and we find their arguments convincing.

The testimony and evidence regarding curtailments relied upon by the ALJ in his Initial Decision and the FPC in Opinion No. 789 concern curtailments in the interstate market through 1975. It is clear that the FERC in rendering Opinion Nos. 10 and 10-A took official notice of the then current curtailment situation in 1978. In Opinion No. 10 the FERC stated that it had taken "notice of various reports on curtailments and supplies in the interstate market filed with this Commission." (Opinion No. 10, p. 9) In discussing its reasons for rejection of the end use rationale for producer reservations, the FERC made reference to the "current situation" in the interstate market. (Opinion No. 10, p. 11) The FERC found that the current curtailment situation indicated that curtailment levels in the interstate market were increasing while supplies to that market were decreasing (Opinion No. 10, p. 12). In concluding its discussion of the policy of producer reservation, the FERC stated,

To continue this policy [of producer reservation] knowing that its implementation actually deprives the interstate market of substantial volumes of gas cannot be supported in light of the current curtailment situation in the interstate market.

(Opinion No. 10, p. 17).

The FERC has in no way, either in its decisions below or in its briefs on appeal, identified the "various reports on curtailments and supplies" it relied upon in finding a serious curtailment situation in the

---

**11.** The petitioners also claim a violation of the FERC's own rule, 18 C.F.R. § 1.26(d) (1980), which reads:

*Official notice of facts.* Official notice may be taken by the Commission and the administrative law judge of such matters as might be judicially noticed by the courts of the United States, or any matters as to which the Commission by reason of its functions is an ex-

pert. Any participant shall, on timely request, be afforded an opportunity to show the contrary. Any participant requesting the taking of official notice after the conclusion of the hearing must set forth the reasons claimed to justify failure to make the request prior to the close of the hearing.

Because we find a violation of the APA procedural provision, we do not address this issue.

interstate market or in finding the probability of a worsening curtailment situation.[12] Thus, at this time, neither this court nor any petitioner knows what information the FERC looked to in reaching this decision. Yet, the question of the curtailment situation in the interstate market was critical in the FERC's reasoning. The perceived curtailment situation was a major factor given by the FERC as to why it was terminating its producer reservation policy. It also was a major factor in its antitrust findings and its finding that producer reservation conflicted with other FERC policies.

Several producer petitioners in their briefs to this court specified evidence indicating projected improvement in the curtailment situation in the interstate market in 1978 and an improvement in total gas reserves and total gas receipts for major interstate pipelines. They also specified evidence of an actual improvement in the curtailment situation in the winter of 1977 through 1978.[13]

■ It is not the law that an agency may never rely on data in its files, or on public information, in rendering a decision. Section 556(e) of the APA recognizes that agency decisions often will rest on official notice of material facts not appearing in the record evidence. However, the statute requires that a party shall have an opportunity to rebut such evidence. Thus, an agency should either disclose the contents of what it relied upon or, in the case of publicly-available information, specify what is involved in sufficient detail to allow for meaningful adversarial comment and judicial review. *U. S. Lines v. Federal Maritime Commission*, 584 F.2d 519 (D.C.Cir. 1978). A caveat placed upon this rule is that the mere fact that an agency has looked beyond the record without opportunity to a party for rebuttal does not invalidate its action unless substantial prejudice is shown to result. *United States v. Pierce Auto Freight Lines*, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946); *Marathon Oil Co. v. EPA*, 564 F.2d 1253 (9th Cir. 1977); *Association of Massachusetts Consumers, Inc. v. SEC*, 516 F.2d 711 (D.C.Cir.1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976); *NLRB v. Johnson*, 310 F.2d 550 (6th Cir. 1962).

■ We do not accept the FERC's argument that no substantial prejudice has been shown here. It maintains that the extra-record material merely upgraded and corroborated evidence of record with regard to the curtailment situation in the interstate market. Because evidence on curtailment was presented to the ALJ during the initial stages of this proceeding, the FERC argues that the issue was clearly present in the case and the producers were not deprived of the opportunity to present relevant information due to lack of notice that the issue was there. The FERC cannot prevail on this argument since the producers complain of the FERC's reliance on extra-record evidence in the interim between the 1975 decision of the ALJ and the March, 1978, decision in Opinion No. 10.[14] In the FPC's

---

12. The FERC did give figures evidently derived from reports in its files concerning the amount of gas being transported under producer reservations from the off-shore federal domain through January 1977. Opinion No. 10, p. 13. It did not specify the source of these documents.

13. No petitioner alleges that it has evidence projecting no curtailment in the interstate market in the future. Instead, the evidence proffered by the producer petitioners allegedly shows a projected improvement in the curtailment situation.

14. *City of Chicago v. FPC*, 147 U.S.App.D.C. 312, 458 F.2d 731 (1971) *cert. denied*, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972), cited by the FERC, does not support the

FERC's contention that producers had adequate notice of the issue in question. In an alternative holding as to why no substantive right had been violated by notice of extra-record evidence in that case, the District of Columbia Circuit noted that the issue on which the FPC took notice had been raised in numerous, similar proceedings. It concluded the issue was clearly present in that case, and the petitioner there had the opportunity to present relevant evidence. Although the producers here had presented evidence relevant to the curtailment situation in the hearing before the ALJ, they complain of the FERC's notice of evidence in the interim period, which they have not had an opportunity to rebut.

notice that rehearing on Opinion No. 789 would be granted, there was no indication that official notice would be taken of curtailment for the interim period in the rehearing nor any indication that the producers should present new evidence on curtailment.

█ Nor do we accept the FERC's argument that any possible prejudice evaporated by failure of the producers to attempt to reopen the record or dispute the FERC's finding on rehearing. Tenneco and the State of Louisiana both complained of reliance on extra-record evidence in their petitions for rehearing, (J.A. pp. 540, 543), and the State of Louisiana specified evidence in its petition for rehearing allegedly indicating there were no major gas curtailments in the winter of 1977 through 1978. (J.A. pp. 544–45) These petitions sufficiently raised the issue of the FERC's official notice of facts and the producers' lack of opportunity to rebut. The FERC's argument that any prejudice evaporated rests on *Alabama-Tennessee Natural Gas Co. v. FPC*, 359 F.2d 318 (5th Cir. 1966), *cert. denied* 385 U.S. 847, 87 S.Ct. 69, 17 L.Ed.2d 78 (1966). It reads this case as establishing the principle that a party must object to reliance on extra-record evidence and request the proceeding be reopened for rebuttal evidence before a party may complain on judicial review of reliance on extra-record evidence. *Alabama-Tennessee Natural Gas* is distinguishable in several respects. First, the issue there was not official notice without opportunity for rebuttal, but rather whether the FPC acted properly in deciding an issue without evidence presented by petitioner. There is no indication there that the FPC relied upon official notice. Also, petitioners in *Alabama-Tennessee* were given timely notice by the FPC that it would consider the pertinent issue in that case separately so that petitioners under the FPC's rules could request reopening of the record for additional evidence on the issue. 359 F.2d at 341–42. This notice occurred before a decision by the FPC which under the FPC's then current rules meant that the parties could request the proceeding be reopened for additional evidence. The FERC's Rules of Practice and Procedure, on the other hand, do not provide for a motion to reopen a proceeding after a Commission decision.[15] We conclude that petitioners did sufficiently bring their objection before the FERC's attention in their petitions for rehearing, that they were not required to make a formal motion to reopen the proceedings, and that they have made a sufficient showing of prejudice.

We follow the lead of our brothers in the District of Columbia Circuit in *U. S. Lines v. Federal Maritime Commission, supra*, in concluding the FERC's action in relying on official notice was improper. There, the District of Columbia Circuit found improper an agency's reliance on "reliable data reposing in the files of the Commission." 584 F.2d at 533. The District of Columbia Circuit found two faults with action by the Federal Maritime Commission. First, the agency's action deprived the parties of fairness in denying them the opportunity to be heard on their views of the facts on which

---

15. 18 C.F.R. § 1.33 (1980) provides for reopening proceedings before the FERC. The relevant provision for asking for a reopening of a hearing before the Commission proper is section 1.33(c), which reads:

(c) *By Commission action.* The above provisions of this section shall apply equally to petitions for and the issuance by the Commission of an order reopening the proceeding, where an initial decision has been issued by the presiding officer but no Commission decision has yet been issued, or where the initial decision by a presiding officer has been omitted and no Commission decision has yet been issued.

18 C.F.R. § 1.34 (1980) provides for applications for rehearing. Section 1.34(b) is the pertinent subsection of this section, and reads:

(b) *Specification of errors.* Such petitions for rehearing shall state concisely the alleged errors in the Commission decision or order. If an order of the Commission is sought to be vacated, reversed, or modified by reason of matters that have arisen since the hearing and decision or order, or by reason of a consequence therewith, the matters relied upon by the petitioner shall be set forth in the petition.

This subsection in no way provides for a request to reopen a proceeding to introduce rebuttal evidence to evidence officially noticed.

the agency took notice. We follow the District of Columbia Circuit; we believe that § 556(e) of the APA, as well as our sense of fair play, requires the FERC to afford the producers here an opportunity to respond to the evidence relied upon by the FERC.[16]

■ Second, the District of Columbia Circuit concluded that official notice of unspecified information in the files of an agency precludes effective judicial review. The District of Columbia Circuit reached that conclusion even on the less stringent arbitrary and capricious standard of review. In our review in the instant case under the substantial evidence standard, we conclude that meaningful review of the FERC's action has been prevented by FERC's reliance upon extra-record evidence. We do not know what evidence the FERC relied upon. Also, in order to have effective judicial review, adversarial comment among the parties regarding the evidence and an opportunity to rebut is essential. The cases make clear the need for such comment in order to allow a court to review action taken by an agency, as well as in facilitating informed agency decision making itself. *U. S. Lines v. Federal Maritime Commission, supra.* Without the producer's comments with respect to the interim period, the rationality of the FERC's decision suffers and this court is precluded from effective review.

■ The FERC argues that reliance on the extra-record evidence was permissible because the curtailment situation in the interstate pipe line is a matter within the FERC's particular expertise. The FERC, in effect, argues that notice of the current curtailment situation is more akin to a legislative fact or legislative judgment than an adjudicative resolution of disputed fact.

The FERC not only made a prediction concerning future curtailment situations, but grounded the decision at issue on data concerning the curtailment situation during the interim period. Such data are not forecasts of the future similar to the forecasts which the Supreme Court held were not required to be supported by testimonial and documentary evidence in *FPC v. Transcontinental Gas Corp.*, 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961). Nor are such data of a judgmental or predictive nature for which complete factual support is not possible or required. *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978). *Industrial Union Department (AFL–CIO) v. Hodgson*, 499 F.2d 467 (D.C.Cir.1974), cited by the Supreme Court in *FCC v. National Citizens Committee for Broadcasting, supra*, stated the distinction clearly:

> What we [as a reviewing court] are entitled to at all events is a careful identification by the [agency], when [its] proposed standards are challenged, of the reasons why [it] chooses to follow one course rather than another. Where that choice purports to be based on the experience of certain determinable facts, the [agency] must, in form as well as substance, find those facts from evidence in the record. By the same token, when the [agency] is obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer, [it] should so state and go on to identify the considerations [it] found persuasive.

499 F.2d at 475–476. The curtailment situation in the interim period is a purely factual matter. Moreover, the interstate pipelines who were participants in this action below are well-equipped to offer rebuttal evidence to the FERC's file information. Accordingly, the FERC was obliged to allow the producer petitioners to present their own evidence on the curtailment situation.[17] On remand, the FERC should spec-

**16.** The official notice of data from a three year period in this case encompasses a longer period of time than the Ninth Circuit found improper in *Marathon Oil v. EPA*, 564 F.2d 1253 (9th Cir. 1977). There the EPA took official notice of data for one year, as well as extensive data in the record period. Because the parties had no opportunity to rebut this data, the Ninth Circuit held such official notice improper. 564 F.2d at 1270–72.

**17.** FERC in its brief cites *General Telephone Co. of Southwest v. United States*, 449 F.2d 846 (5th Cir. 1971), to support the proposition that

ify what data it relied upon in finding an increasing curtailment problem during the interim period from 1975 until Opinion No. 10, and reopen the hearings to allow the producers an opportunity to produce evidence and comment.

(ii) Antitrust rationale.

■ None of the parties question that in a determination of whether the public interest would be served by authorization of interstate transmission of natural gas, the FERC must consider any anticompetitive impact. *Gulf States Utilities v. FPC*, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973); *Atlantic Seaboard Corp. v. FPC*, 404 F.2d 1268 (D.C.Cir.1968); *Northern Natural Gas Co. v. FPC*, 399 F.2d 953 (D.C.Cir.1968). The FERC, in the instant case, concluded that continuation of producer-reservation in the offshore federal domain could give a competitive advantage to integrated firms with access to offshore federal domain gas. It premised this conclusion on the fact that offshore federal domain gas is sold at prices

below those in the market and that offshore federal domain gas would not be subject to curtailment as would interstate supplies. The FERC perceived the possibility that these two factors might result in higher profits for integrated firms, might create artificial entry barriers for competitors, and might result in eventual concentration of certain industries in firms with access to offshore federal domain gas. The FERC noted that such concentration might not result if a few applications for transmission of producer-reserved gas were approved, but believed the possibility of such concentration existed if allowance of producer-reservation policy continued in the future.

■ Several producer-petitioners complain that the FERC's conclusion with respect to the possible long-term effect of the producer-reservation policy is not supported by substantial evidence.[18] We conclude this contention is misplaced. Admittedly, there is not an elaborate analysis in the record supporting the FERC's projection. But the

---

the Commission may look beyond the record and draw upon its own expertise and experience. However, the *General Telephone* decision was based largely on policy, and was also a rule-making proceeding. This court noted, "It is clear that the findings required of an agency in its rule-making capacity are of a different nature from those required in adjudication." 449 F.2d at 862. Obviously, even in an adjudication, an agency may legislate a policy or standard. In this request for certificates of public convenience and necessity, the FERC has promulgated a general policy. Even so, the FERC should not have relied on evidence known only to it. "It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of ... data that, [in] critical degree, is known only to the agency." *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 393 (D.C.Cir.), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1973). *Accord U. S. Lines v. Federal Maritime Commission*, 584 F.2d at 534 n. 44. *See also* K. Davis, *Administrative Law Treatise*, § 6:17 (2d ed. 1978), at p. 530:

Whenever either a court or an agency legislates by any means, it may go anywhere for the legislative facts it needs. But whether the legislating is done in an adjudication or in a rule-making proceeding, fairness requires that those who oppose the legislation should have opportunity to challenge any facts the tribunal uses that are susceptible of reasonable challenge. If either a court or an agency

denies such opportunity to challenge its action, whether in an adjudication or in rule-making, its action is subject to reversal.

18. Several producers make individual objections to the FERC's reasoning on the antitrust factor. We find no merit in these objections. Estech General objects that the FERC ignored prior findings and conclusions in Opinion No. 789 with respect to anticompetitive ramifications of producer-reservations. Opinion No. 789, however, had no findings or conclusions on antitrust effects. Tenneco claims that the FERC's reasoning was limited to affiliated or subsidiary plants producing fertilizer, and therefore this portion of Opinion No. 10 is inapplicable to its Chalmette refinery. On the contrary, the FERC's reasoning was applied to integrated firms, of which fertilizer producers were mentioned only as examples. First Mississippi claims that its Ampro fertilizer plant did not have a price advantage over the interstate market because it was paying the highest "just and reasonable" rate for its offshore gas. This factor does not eliminate the reliability of supply factor which the FERC found important in its antitrust reasoning. Also, with respect to the individual objections of Tenneco and First Mississippi, the fact that the FERC was looking at the long-term effects of a policy meant that not every producer's situation had to conform precisely to the factors the FERC deemed relevant.

FERC's projection of likely antitrust effects of a policy, unlike its findings regarding the current curtailment situation, is largely judgmental, not capable of resting on factual analysis, but of necessity resting largely on the FERC's forecast of public interest based upon its expert knowledge. The Supreme Court, in *FCC v. National Citizens Committee for Broadcasting*, a case involving regulations of the Federal Communications Commission requiring certain broadcasters to divest themselves of ownership of newspapers in the same city, stated:

> However, to the extent that factual determinations were involved in the Commission's decision to grandfather most existing combinations, they were primarily of a judgmental or predictive nature—e. g., whether a divestiture requirement would result in trading of stations with out-of-town owners; whether new owners would perform as well as existing crossowners, either in the short run or in the long run; whether losses to existing owners would result from forced sales; whether such losses would discourage future investment in quality programming; and whether new owners would have sufficient working capital to finance local programming. In such circumstances complete factual support in the record for the Commission's judgment or prediction is not possible or required; "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency," *FPC v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 29, 81 S.Ct. 435 [450], 5 L.Ed.2d 377 (1961); see *Industrial Union Dept., AFL–CIO v. Hodgson*, 162 U.S.App.D.C. 331, 338–339, 499 F.2d 467, 474–475 (1974).

436 U.S. 775 at 813–14, 98 S.Ct. 2096 at 2121, 56 L.Ed.2d 697. We discern no significant difference between a projection of the effect of a divestiture order and the FERC's projection of anticompetitive ef-

fect. The Supreme Court's argument supports the FERC's reasoning in this case.[19]

Nevertheless, we must vacate the FERC's finding regarding the antitrust rationale. Insofar as the FERC's antitrust reasoning rested upon a factual finding respecting the curtailment situation as it developed between Opinion No. 789 and Opinion No. 10, it suffers from the defect we noted in our discussion on the curtailment rationale. There was no opportunity for the parties to introduce evidence concerning the current curtailment situation of which the FERC took official notice. Because we cannot discern how significant the curtailment situation was to the FERC's reasoning, the FERC's finding with respect to the antitrust rationale must be vacated, and the producers given an opportunity to present evidence on the current curtailment situation.

(iii) Conflict with prior opinions.

The FERC also concluded that the policy of producer-reservation conflicted with the policy enunciated in Order No. 533, 54 F.P.C. 821 (1975). Order No. 533 enunciated a policy that interstate pipelines would be permitted to transport gas from any source except the offshore federal domain for direct sales by producers to high priority industrial and commercial users if certain conditions, not relevant to our discussion, were met. The producer petitioners maintain that because offshore federal domain sources were excluded from the provisions of Order No. 533, there is no real conflict.

The producer petitioners read Order No. 533 too narrowly. The FPC there made clear that the purpose of Order No. 533 was to allow diversion of gas from sources otherwise serving the intrastate market into the interstate market. It expressly stated that the only reason offshore federal domain gas was excluded from the provisions of Order No. 533 was that this gas is al-

---

**19.** The FERC in Opinion No. 10–A noted that the antitrust rationale was not essential to its decision but was merely one of the many factors entering its calculus. (Opinion No. 10–A, p. 6). It stated it would have reached the same result even had its conclusions with respect to the anticompetitive results been different. (*Id.*) The producer petitioners admit that the antitrust rationale was a secondary factor in the FERC's reasoning.

ready subject to interstate jurisdiction by law. Because Order No. 533 was an implementation of an attempt to alleviate curtailments in the interstate market by shifting gas from the intrastate market to the interstate market, the FERC's conclusion that producer-reservation conflicted with the policy of Order No. 533 was reasonable and, indeed, accurate.

(iv) Price advantages.

The FERC finally supported its decision to abolish its policy of producer-reservations on the ground that producer-reservations permits producers with both offshore and onshore reserves to retain lower priced offshore gas for use in their own facilities while selling onshore gas to the intrastate market at a substantially higher price. This practice would effectively allow such a producer to realize a rate of return in excess of that found by the FERC to be just and reasonable in calculating the price of offshore federal domain gas.

None of the producer petitioners attack this finding of the FERC. Such an attack would be difficult as this conclusion, based on a comparison of rates, is well within the expertise of the FERC. Accordingly, this finding by the FERC remains unscathed.

### END USE CONSIDERATION

■ In giving the four reasons why it was terminating what it described as the "end use" adaptation of the *Chandeleur* policy, the FERC in Opinion No. 10 did not compare the proposed end use by the producer petitioners with likely end use of the gas if dedicated to the interstate market. It also suggested that such comparison would be impossible. Petitioners Estech General and TransOcean complain that the FERC was required to compare the proposed end use with likely alternative end use under the § 7 certification standards.[20]

In *F. P. C. v. Transcontinental Gas Pipe Line Corp., supra,* the Supreme Court held that because natural gas is a wasting resource for which the necessity of conservation is paramount, the FPC has the authority to consider the proposed end use in determining the public convenience and necessity within a certification proceeding. The Supreme Court grounded this holding, *inter alia,* on an amendment to § 7 of the Natural Gas Act in 1942,[21] passed at the request of the FPC because of what it perceived as a defect in the original § 7 which prevented it from taking the action it believed necessary to preserve this nation's natural gas resources. It concluded that the FPC had properly considered the fact there that the proposed use was for industrial boilers in denying a certificate of public convenience and necessity.

The District of Columbia Circuit, in reviewing the original *Chandeleur* decision of the FPC, remanded the case because of the FPC's failure to compare end uses of the gas proposed to be reserved with interstate uses. *Public Service Comm. of State of New York v. F. P. C.,* 436 F.2d 904 (D.C.Cir. 1970). Without announcing a general obligation to consider end use in every certification proceeding, the court there imposed upon the Commission a duty to consider end use in determining whether to allow producer-reservations under the *Chandeleur* incentive.

The FERC's handling of the issue of end use in Opinion Nos. 10 and 10–A is less than perfectly clear. In Opinion No. 10, the FERC stated:

> The social utility of permitting the gas to be used by the producers cannot be determined by looking at the end use priority of their facilities.

(Opinion No. 10, p. 12). It noted that instead of looking simply at the proposed end use, a comparison would have to be made between the proposed end use and the need for the gas by ultimate consumers of interstate pipelines. It concluded it had no mechanism for making a comparison since the FERC did not possess reliable data on end use in the "intrastate market." This last statement is puzzling since the appro-

---

**20.** Estech General brief, pp. 15–20.

**21.** Act Feb. 7, 1942; C. 49, 56 Stat. 83.

priate comparison would be between the proposed end uses as specified in the producers' applications and the end uses of customers in the interstate market, since the FERC had enunciated its policy of doing what it could to direct this gas into the interstate system.

In Opinion No. 10–A, the FERC did address the end uses proposed by the producer petitioners. The FERC found that all interstate pipelines involved in this proceeding were often curtailing customers of a similar end use priority. Although pipeline gas in these systems go to customers of lower priority at times, the FERC concluded that occasional curtailment of interstate customers of similar priority, while the applicants in this case would have an assured supply, made the occasional use by lower priority customers not a sufficient reason to grant the requested certificates.

 Despite the difficulty of reconciling the language in Opinion No. 10 with what was done in Opinion No. 10–A, we nevertheless conclude that the FERC has adequately considered end use in its decision. A court should uphold an agency, even when its decision lacks ideal clarity, if the "agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas Best Freight, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Kurzon v. United States Postal Service*, 539 F.2d 788 (1st Cir. 1978); *Alabama Power Co. v. F. P. C.*, 511 F.2d 383, 392 (D.C.Cir.1974). We are not left wondering here whether the FERC did or did not compare the end use to which the reserved gas would have been put with its likely alternative use in the interstate system. In Opinion No. 10–A, the FERC clearly concluded that the proposed end use for the reserved gas was equal with the end use of customers in the interstate market who were suffering serious curtailments. This was adequate comparison of the end use factor.

## RETROACTIVE TERMINATION

 The producers argue that the FERC's promulgation of a policy terminating the policy of allowing producer-reserva-

tion was improperly retroactive. They maintain that the FERC should have developed the policy announced in Opinion Nos. 10 and 10–A in a rulemaking proceeding to be applied prospectively. We disagree.

The Supreme Court has approved the discretion of an agency to announce a general principle in an adjudication. In *NLRB v. Bell Aerospace*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), the Court stated:

[It is] plain that the Board is not precluded from announcing new principles in an adjudication proceeding and that the choice between rulemaking and adjudication lies in the first instance within the Board's discretion.

416 U.S. at 294, 94 S.Ct. at 1771. The Supreme Court, however, indicated that there are limitations to that discretion:

The possible reliance of industry on the Board's past decisions with respect to buyers does not require a different result. It has not been shown that the adverse consequences ensuing from such reliance are so substantial that the Board should be precluded from reconsidering the issue in an adjudicative proceeding. Furthermore, this is not a case in which some new liability is sought to be imposed on individuals for past actions which were taken in good-faith reliance on Board pronouncements. Nor are fines or damages involved here.

416 U.S. at 295, 94 S.Ct. at 1772.

The producers have not suffered sufficiently adverse consequences from reliance on the former policy of producer reservation to preclude the FERC from exercising its discretion. The policy of producer reservation announced in *Chandeleur* was controversial and was clearly announced to be experimental to encourage production. *In re Chandeleur Pipe Line Co.*, 44 F.P.C. 1747 (1970), aff'd. *Public Service Commission of State of New York v. FPC*, 463 F.2d 824 (D.C.Cir.1972). It was contested vigorously in *Chandeleur* itself and in subsequent cases in which producer reservations were allowed. *Mobil Oil Corp.*, Opinion No. 743, 54 F.P.C. 1049 (1975); *Tennessee Gas Pipeline Co.*, Opinion No. 727, 53 F.P.C. 1206 (1975).

The policy of producer-reservation was by no means well-established in light of these continuing attacks, *see Retail, Wholesale and Department Store Union, AFL–CIO v. NLRB*, 466 F.2d 380, 390 (D.C.Cir.1972), and the producers were in no way assured, when they acquired the leases in question, that they could reserve a portion of the gas produced for their own use or for direct sales to specified customers. The producers are not barred from attempting to sell the gas produced in the offshore federal domain to other customers and there is no reason to believe they would not be successful in their attempts to do so.[22] Accordingly, we reject this argument.

## CHANGED CIRCUMSTANCES RESULTING FROM ENACTMENT OF THE NGPA

■ Opinion No. 10–A, denying a rehearing of Opinion No. 10, was issued on June 21, 1978. On November 9, 1978, the Natural Gas Policy Act of 1978 ("NGPA"), Pub.L. 95–621, 92 Stat. 3352, 15 U.S.C.A. §§ 3301 *et seq.* (West Supp. 1981), was enacted. Thereafter, First Mississippi and Air Products filed motions with the FERC for reconsideration of its opinions in light of the NGPA.[23] The FERC in the exercise of its discretion determined not to grant the petitions for reconsideration. Producer petitioners argue that FERC erred in not reconsidering after enactment of the NGPA and maintain that this court should remand the FERC's decision for reconsideration in light of the NGPA.

Courts have shown a proper reluctance to order a remand of an agency's decision on the ground that the decision relies on evidence which has grown stale, either because of the passage of time or new legislation while the decision awaits judicial review.

*American Optometric Association v. FTC*, 626 F.2d 896 (D.C.Cir.1980). The Supreme Court has made a significant statement on this problem:

> One of the grounds of resistance to administrative orders throughout federal experience with the administrative process has been the claims of private litigants to be entitled to rehearings to bring the record up-to-date and meanwhile to stall the enforcement of the administrative order. Administrative consideration of evidence—particularly where the evidence is taken by an examiner, his report submitted to the parties, and a hearing held on their exceptions to it—always creates a gap between the time the record is closed and the time the administrative decision is promulgated. This is especially true if the issues are difficult, the evidence intricate, and the consideration of the case deliberate and careful. If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process would ever be consummated in an order that would not be subject to reopening. It has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion. And likewise, it has been considered that the discretion to be invoked was that of the body making the order, and not that of the reviewing body.

*Interstate Commerce Commission v. Jersey City*, 322 U.S. 503, 514–515, 64 S.Ct. 1129, 1134–1135, 88 L.Ed. 1420 (1944); *see also American Optometric Association v. FTC, supra.*

---

22. The producers have not suffered the financial detriment suffered by pipelines in *United Gas Pipe Line v. FERC*, 597 F.2d 581 (5th Cir. 1979) and in *Natural Gas Pipeline Company of America v. FERC*, 590 F.2d 664 (7th Cir. 1979), where the FERC disallowed substantial advances from the pipelines' rate base already made to producers to encourage production. The pipelines there had made the advances on reliance of FERC policy announced to encourage production, only to have the advances removed from their rate base by a subsequent limitation on the policy.

23. Motions in support of the petitions for further consideration were filed also by Senator James O. Eastland, Mississippi Congressman, and the Louisiana Congressional Delegation.

The District of Columbia Circuit has noted that despite the Supreme Court's statement, there are occasions when the equities of a situation require a remand to an agency for further consideration in light of new evidence. The District of Columbia Circuit states that a remand is required in the interest of a just result, "where there has been a change in circumstances, subsequent to administrative decision and prior to court decision, that is not merely 'material' but rises to the level of a change in 'core' circumstances, the kind of change that goes to the very heart of the case." *American Optometric Association v. FTC*, 626 F.2d at 907, quoting *Greater Boston Television Corp. v. FCC*, 149 U.S.App.D.C. 322, 337, 463 F.2d 268, 283 (1971), *cert. denied* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972). We believe that the District of Columbia Circuit's statement is an accurate description of how extensive the changes must be before a remand is called for. While we conclude that enactment of the NGPA has in all probability affected material facts relied upon by the FERC, we do not believe that the enactment of the NGPA has changed the "core" circumstances going to the very heart of the case.

A. Producers note that the FERC's primary rationale for its decision in Opinion No. 10 was based on the premise that gas supplies for the interstate market were scarce, while gas supplies in the intrastate market were adequate to serve industrial users. They maintain on appeal that an underlying premise relied upon by the FERC in finding a curtailment situation in the interstate market was the then existing distinction between prices in the intrastate and interstate markets. Producers argue that the enactment of the NGPA with its establishment of price controls over the intrastate market has established a national system of price controls for new gas flowing to both markets;[24] because the intrastate market is now controlled by the NGPA, there is no incentive for producers to restrict sales only to intrastate customers. Thus, the producers maintain that the dichotomy between the interstate and intrastate markets has been terminated, and that the rationale of Opinion Nos. 10 and 10–A is no longer viable.

Although the NGPA is complex legislation and was the result of political compromise among many interests often promoting contradictory goals, one goal of the NGPA was to alleviate natural gas shortages suffered by the interstate market.[25] Insofar as the FERC in Opinion Nos. 10 and 10–A was attempting to alleviate shortages in the interstate market, its rationale is in accord with the NGPA. There is no assurance that the NGPA will be successful in eliminating gas shortages to the interstate system. Indeed, §§ 401 and 402 of the NGPA anticipated that curtailment plans in the interstate market would continue, specifying certain priorities for certain industries in the interstate market.

*Burlington Truck Lines v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), relied upon by petitioners, is distinguishable from this case. In *Burlington Truck Lines*, the ICC issued a certificate of public convenience and necessity to a motor carrier just then formed to carry freight which established carriers refused to handle

**24.** For the purposes of the producers' argument, the scheme of the NGPA may be described as follows. The NGPA establishes statutory price ceilings for gas no longer under the FERC's jurisdiction. This gas may receive an incentive price pursuant to § 102 (new gas), 103 (new onshore production well), 107 (high-cost gas), or 108 (stripper well gas). Intrastate gas was brought under federal control and may be priced under §§ 105, 106(b), or one of the above incentive prices. Gas committed or dedicated to interstate commerce on November 8, 1978, and not removed from NGA jurisdiction may receive prices established under §§ 104, 106(a), 108 and 109(a)(2). Sections 104 and 106(a) provide for an inflation adjusted price based upon the most recent FPC national rate order. *See Pennzoil Co. v. FERC*, 645 F.2d 360, pp. 379–381 (5th Cir. 1981). Gas committed or dedicated to interstate commerce and subject to §§ 104 and .106(a) would not receive the higher incentive prices.

**25.** *See* H.R.Rep.No. 496, pt. IV, 95th Cong., 1st Sess. 101 (1977); Congressional Budget Office, The Natural Gas Compromise Report 2 (1978), *reprinted in* 124 Cong.Rec. H13126–27 (daily ed., Oct. 14, 1978).

because of a union's secondary boycott demands. The ICC indicated it would not attempt to adjudicate the labor dispute. After final action by the ICC, but before initial judicial review, Congress added a section to the National Labor Relations Act making illegal agreements between labor organizations and employers whereby the employer agrees to refrain from dealing with any other person. A three-man district court had upheld the issuance of the certificate, despite protesting carriers' assertions that the change in law had mooted the case by making the union activities illegal and unlikely to be resumed. The Supreme Court concluded that the reviewing court, in the exercise of its sound discretion, should not have affirmed the order but should have vacated it and remanded it for further consideration in light of the changed circumstances. The enacted legislation made illegal precisely the type of action which precipitated the need for the newly-formed motor carrier, and provided new injunctive relief to prevent similar union activities in the future. The NGPA cannot be construed to have such a direct impact on the FERC's reasoning in this case. Both the NGPA and Opinion Nos. 10 and 10–A are aimed at alleviating the same problem, and there is no evidence that NGPA alone is sufficient to eliminate the problem.

*American Optometric Association v. FTC, supra,* is also distinguishable. There the District of Columbia Circuit was reviewing proposed regulations of the Federal Trade Commission ("FTC") prohibiting absolute bans by states or professional organizations of advertising of ophthalmic services or goods. The proposed regulations did permit state and professional organizations to require affirmative disclosure of certain items in any advertising. After the record had been closed to interested parties but before final FTC action, the Supreme Court decided *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). There the court extended the First Amendment's protection to include a lawyer's right to advertise the prices of routine services. Several officials of the FTC noted that the

proposed rule would be superfluous in light of *Bates* if directed only to total bans on advertising. There was evidence in the record that the FTC believed only the affirmative disclosure requirements of the proposed rule went beyond *Bates.* The District of Columbia Circuit remanded for reconsideration in light of the circumstances after *Bates.* It explained that the rule approached the outer boundaries of the FTC's authority to preempt state law and that the FTC had amassed considerable evidence with respect to the total ban on advertising but almost no evidence on the affirmative disclosure requirements. The District of Columbia Circuit also noted that officials of the FTC acknowledged the significant impact of *Bates.* In *American Optometric Association,* the Supreme Court clearly preempted what the FTC was proposing to do. The NGPA, however, does not preempt the FERC's concern over curtailment.

Our conclusion that the NGPA does not require a remand is bolstered by the fact that several factors relied upon by the FERC denying the petitioners' certificates are not affected by the NGPA. The concern over curtailments in the interstate market was relevant only to the FERC's discussion of why it abolished the policy of producer reservation. The FERC also looked to factors unique for each petitioner in deciding to refuse the certificates. With respect to First Mississippi and the Ampro Plant, the FERC noted that there was a question as to whether there was sufficient offshore gas for the plant and noted that First Mississippi was engaged in active development and exploration onshore. The FERC noted that Swift's witness indicated that Swift could obtain sufficient natural gas onshore. With respect to Air Products, the Commission noted the prior contract with Tenneco for intrastate gas, and declined to become embroiled in a contract dispute. The FERC noted that Tenneco had large substantial onshore reserves that it could devote to its Chalmette Refinery.

■ B. Section 401 of the NGPA, 15 U.S.C.A. § 3391 requires that curtailment plans for interstate pipelines place certain

essential agricultural uses in a high priority classification. Producer petitioners with an hydrous ammonia plants argue that this section establishes the clear priority of fertilizer manufacture and undermines the FERC's conclusion that it could not compare end product, produced by natural gas.[26]

Section 401 of the NGPA does not go to the core of the FERC's opinion for two obvious reasons. First, the FERC's conclusion that it did not have the ability to compare end products was only one factor among four in its decision to abolish its producer reservation policy. Second, section 401 requires the curtailment plans of interstate pipelines to establish a high priority for essential agriculture uses. A concern of Congress in enacting this provision was to assure that fertilizer plants dependent on interstate supplies would not be curtailed as they had been during the winter of 1973–74 when curtailments were serious.[27] Insofar as the underlying rationale of FERC's opinion was concern over curtailment of interstate pipelines, section 401 and Opinion Nos. 10 and 10–A are complementary.

## SEPARATION OF FUNCTIONS

Prior to the applications initiating these proceedings, Tenneco and Tennessee had been producing and delivering gas from the offshore leases in question to Creole Gas Pipeline Corporation ("Creole"), an intrastate pipeline, for delivery to Air Products and its Chalmette Refinery without the necessary certificates of public convenience and necessity. In their applications, Tenneco and Tennessee acknowledged this transportation and explained that they initially had believed it not to be within the jurisdiction of the FPC. They conceded jurisdiction over the movement and requested the FPC to issue a certificate retroactive to

whatever date jurisdiction may have attached.[28]

The Initial Decision by the ALJ found no evidence of willful violation of the NGA and also found that had the applications been timely filed, they surely would have been approved under the *Chandeleur* theory. (J.A. 330) The FPC in Opinion No. 789 noted these findings but failed to adopt or reject them. (Opinion No. 789, J.A. p. 402). The certificate issued to Tennessee and Tenneco was silent as to whether it was retroactive to the date the movement began, merely authorizing the transportation in question. Although there was no express retroactive certification, the record contains no indication that the FPC had initiated an investigation of the precertificated movement or had any intentions of pursuing the matter further.

When the FERC assumed the responsibilities of the FPC, an Office of Enforcement, the investigative staff of the FERC, was formed. On January 30, 1978, the Office of Enforcement sent a memorandum to the Commission proper, informing the Commission members that the Public Service Commission of New York had alleged in its petition for rehearing that Tenneco and Tennessee had violated § 7 of the NGA, that the Office of Enforcement was investigating the matter, but that the Office of Enforcement was prepared to make no specific recommendations. (Post-oral argument letter brief of Tenneco, Exh. A). The letter was merely informational, concerning the activities of the Office of Enforcement. The memorandum indicated that the Office of Enforcement was prepared to discuss the matter with any member of the Commission, but there is no evidence in the record that any further contact occurred before issuance of Opinion No. 10.

In Opinion No. 10, the FERC noted that allegations of violation of § 7 of the NGA

---

26. First Mississippi in its brief informs this court that the United States Department of Agriculture has certified its Ampro plant natural gas requirement as an essential agricultural use pursuant to § 401 of the NGPA.

27. Remarks of Senators Talmadge and Jackson, 124 Cong.R. 14957 (daily ed., Sept. 12, 1978).

28. Parties protesting this requested certificate alleged a violation of § 7 of the NGA with respect to this movement.

had been made. Rather than resolve these allegations, the FERC severed the allegations for action at a later date. (Opinion No. 10, Order (J)).

Between the issuance of Opinion No. 10 and Opinion No. 10–A, the Office of Enforcement formulated a recommendation on whether a private investigation should be made of these allegations. A two-page memorandum from an officer of the Office of Enforcement to the Commission, dated May 31, 1978, conveyed this recommendation. Subsequent to this memorandum, the Office of Enforcement sent a representative to a closed meeting of the Commission on June 8, 1978, to discuss whether a private investigation of these allegations should be initiated.[29] As a result of this meeting, public notice was given simultaneously with the issuance of Opinion No. 10–A, ordering the Office of Enforcement to initiate a private investigation of the allegation made in the applications now under review.

■■■ Subsequent to the issuance of Opinion No. 10–A, and in conjunction with the ensuing investigation, Tenneco obtained an expurgated version of the May 31, 1978, memorandum through a request under the Freedom of Information Act, 5 U.S.C.A. § 552.[30] The FERC withheld a portion of this memorandum, claiming the withheld portion contained only opinions, analyses and recommendations for the proposed investigation. (Affidavit of Joyce R. Morrison, Acting Director, Division of Public Information, FERC, App. D of FERC brief). Tenneco thereupon brought suit to obtain the withheld portion. A district court in finding the withheld portion to be exempt from disclosure, found it contained "opinions, analyses and recommendations concerning investigatory and adjudicatory proceedings" and "formed an integral part of the Commission's predecisional deliberative process in those proceedings." *Tenneco v. FERC*, C.A. No. 79–1052 (D.D.C. Sept. 12, 1979). Now, before this court, Tenneco argues that the memorandum, together with the closed meeting on June 8, 1978, reveal a violation of the separation of functions. Its argument is premised on the fact that the memorandum references the docket numbers with respect to Tenneco's applications for certificates of public convenience and necessity now on appeal, and on the district court's finding that the May 31 memorandum concerned "adjudicatory" proceedings. Tenneco is properly concerned from this language that a violation of the requirement of separation of functions has occurred and asks reversal of Opinion Nos. 10 and 10–A and reinstatement of Opinion No. 789.[31] Tenneco maintains that constitutional due process as well as 5 U.S.C.A. § 554(d) and 18 C.F.R. § 1.30(f) have been violated by the FERC's procedure.[32]

29. Proper notice of this meeting was published pursuant to Section 3(a) of the Government in the Sunshine Act, 5 U.S.C.A. § 552b (West 1977).

30. The expurgated version of the memorandum reads as follows:

```
Reference: Docket Nos. CP75-45, CP75-466, et al
Company Tenneco Inc.

MEMORANDUM TO = The Commission

FROM = Office of Enforcement

CONTACT = Thomson von Stein, OE, X51832

ACTION ITEM = Proposed Order of Private
 Investigation

CASE SUMMARY = In Docket Nos. CP75-45, et al. and a
related matter, CP75-466 respectively, various
allegations were made by intervenors and others as to
(1) whether Tenneco Oil Company, a subsidiary of
Tenneco Inc., Tennessee Gas Pipeline Company, a
division of Tenneco Inc. ("Tennessee"), or others,
had violated the Natural Gas Act when Tennessee
transported certain natural gas without a required
```

```
certificate of public convenience and necessity and,
(2) whether Tenneco Oil and Tennessee had violated
the Natural Gas Act and the rules thereunder in
diverting gas dedicated to the interstate market to
an intrastate pipeline, Creole Gas Pipeline Company
("Creole") for delivery to industrial customers of
Creole.
```

Tenneco brief, Appendix F, p. 2.

31. None of the other petitioners join Tenneco's argument or maintain that any violation with respect to Tenneco's application would taint their application.

32. Tenneco appears to argue that a comparison of the Initial Decision of the ALJ and Opinion No. 789, with Opinion Nos. 10 and 10–A, reveals the issue of the violations of the NGA were resolved favorably to Tenneco in the former opinions, but that in the latter opinions the FERC decided to sever the issue for further discussion. Tenneco, without the benefit of

At Tenneco's post-oral argument suggestion, the FERC has submitted to this court *in camera* the complete May 31, 1978, memorandum and a transcript of the June 8, 1978, closed meeting. The FERC states that these are all the memoranda and transcripts on file of communication between the Office of Enforcement and the Commission occurring before issuance of Opinion No. 10–A.

Both 5 U.S.C.A. § 554(d) and 18 C.F.R. § 1.30(f) provide in effect that an employee engaged in investigative functions may not, either in that or a factually related case, participate or advise in the decision, recommended decision, findings or conclusions except as witness or counsel in public proceedings.[33] We have thoroughly reviewed *in camera* the May 31 memorandum and the transcript of the June 8 meeting. The communications from the Office of Enforcement to the Commission related only to the initiation of an investigation of the allegations made. No recommendation or comment was made with respect to the applications now under review. No facts were discussed with respect to the applications now under review or even with respect to

the alleged violations under investigation by the Office of Enforcement. The only substantive comment made was the recommendation of the Office of Enforcement that a private investigation was warranted.[34]

■ The FERC, as does many other agencies, combines the functions of investigator, prosecutor and judge.[35] Only the Commission may order formal investigations. and may do so after *ex parte* recommendation by an investigative staff member. 18 C.F.R. §§ 1b.5 and 1b.6 (1980). Although 5 U.S.C.A. § 554(d) requires separation of the adjudicatory and prosecutorial functions in an agency, subpart (C) of subsection (d) exempts the "agency or a member or members of the body comprising the agency" from that requirement. The practice of reviewing the recommendations of the investigatory staff of the FERC and then ordering a formal investigation is clearly within the exception to the APA. *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Kennecott Copper Corp. v. FTC*, 467 F.2d 67 (10th Cir. 1972), *cert. denied*, 416 U.S. 909, 94 S.Ct.

---

seeing the May 31 memorandum or the June 8 transcript, argues this demonstrates the influence of the Office of Enforcement on the opinions now under review. We disagree with Tenneco that the Initial Decision of the ALJ and Opinion No. 789 resolved the issue of the alleged violation favorably to Tenneco. We read those opinions as taking no stand on the violation issue and not including it as a factor in the reasoning adopted therein. Moreover, Opinion No. 10 severing the violation issue was issued before the May 31 memorandum and the June 8 transcript in question.

**33.** 5 U.S.C.A. § 554(d) (West 1977) reads in pertinent part:

An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings. This subsection does not apply—

(A) in determining applications for initial licenses;

(B) to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; or

(C) to the agency or a member or members of the body comprising the agency.

18 C.F.R. § 1.30(f) (1980) reads in full:

(f) *No participation by investigative or prosecuting officers.* In any proceeding in which a Commission adjudication is made after hearing, no officer, employee, or agent assigned to work upon the investigation or trial of the proceeding or to assist in the trial thereof, shall, in that or any factually related proceeding participate or advise as to the findings, conclusions or decision, except as a witness or counsel in public proceedings.

**34.** This court fails to understand why the FERC did not make the May 31 memorandum and the June 8 transcript available to Tenneco in light of the nonsubstantive nature of the communication made.

**35.** *See* Padersen, *Decline of Separation of Functions in Regulatory Agencies*, 64 Va.L.R. 991 (1978).

1617, 40 L.Ed.2d 114 (1974); *FTC v. Cinderella Career and Finishing Schools, Inc.,* 404 F.2d 1308, 1315 (D.C.Cir.1968). The courts have also uniformly held that this feature does not make out an infringement of the due process clause of the Fifth Amendment.[36] *FTC v. Cinderella Career and Finishing Schools, Inc., supra; United States v. Litton Industries, Inc.,* 462 F.2d 14 (9th Cir. 1972); *Kennecott Copper Corp. v. FTC, supra; see Withrow v. Larkin, supra,* (finding no due process violation with respect to similar state administrative proceeding).

Tenneco does not argue the propriety of the investigatory staff recommending a formal investigation. Rather, Tenneco maintains that the Commission, in considering Opinion No. 10–A, considered facts communicated to it *ex parte* by the Office of Enforcement relevant to the adjudication now under review. Our review of the memorandum and the transcript of the June 8 meeting shows that there was no recommendation or opinion with respect to the issues relevant to the applications now under review, nor was there any discussion of factual material with respect to these applications. Indeed, there was only a recommendation to the Commission with respect to the proposed investigation, and there were no facts communicated with respect to the proposed investigation. The communications made only a recommendation on the narrow question of whether a private investigation should ensue. We conclude that there was no participation or advice from the Office of Enforcement to the Commission with respect to the producers' applications. Accordingly, § 554(d) and 18 C.F.R. § 1.30(f) have not been violated.

Similarly, Tenneco's due process argument also fails.[37]

### CONSUMER PETITIONERS' REQUEST FOR PAYBACK

The consumer petitioners requested the FERC to require Tenneco to make gas paybacks or monetary refunds to reimburse the interstate market for the gas transported under the certificates of Opinion No. 789 and later withdrawn under Opinion No. 10. The consumer petitioners, together with Tenneco and Air Products, read Opinion Nos. 10 and 10–A as rejecting the consumer petitioners' request. The FERC's counsel, on appeal, reads Opinion Nos. 10 and 10–A as severing this request for consideration in a separate proceeding. The consumer petitioners request that we remand for the limited purpose of having the FERC either clearly sever this issue for separate consideration or state its reasons for denying their request.

We are unable to ascertain with any certainty whether the FERC has rejected the consumer petitioners' request or severed the issue for separate consideration. Moreover, if the FERC has rejected the consumer petitioners' request, it has failed to enunciate the reasons why. On remand, the FERC should clearly state whether it shall consider the consumer petitioners' request in another proceeding. If Opinion Nos. 10 and 10–A rejected the consumer petitioners' request, the FERC should articulate its reasons for so doing. The payback demand was a serious and important issue and required more than the perfunctory treatment given it by the FERC if the request were denied in Opinion Nos. 10 and 10–A. *Central Power & Light Co. v. United States,* 634 F.2d 137, 177–78 (5th Cir. 1980);

---

**36.** It has been held, however, that a commissioner who had previously served on an investigatory or prosecutory staff in a case may not sit as a member of the Commission in deciding it. *Amos Treat & Co. v. SEC,* 306 F.2d 260 (D.C.Cir.1962).

**37.** Tenneco, in a post-oral argument letter to this court, suggests that it be permitted to inspect the Office of Enforcement's communications to the Commission at such time and under such conditions as this court deems ap-

propriate. We find nothing in the material brought to this court's attention which suggests the Commission relied upon improper evidence. Certainly, there is nothing to overcome the "presumption of honesty and integrity in those serving as adjudicators," *Withrow v. Larkin,* 421 U.S. at 47, 95 S.Ct. at 1464, for this court to order disclosure to Tenneco. *See also United States v. Litton Industries, Inc.,* 462 F.2d at 17.

*Pitre Brothers Transfer v. United States,* 580 F.2d 140 (5th Cir. 1978).[38]

VACATED AND REMANDED.

**38.** Finally, the producers raise the usual arguments that the FERC's findings with respect to each individual producer and pipeline are without substantial evidence and that the FERC's reasoning in Opinion Nos. 10 and 10–A was arbitrary and capricious. Other producers make arguments that their situation is unique, requiring special consideration by FERC. We find no merit in these arguments.