# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 20, 2022

Lyle W. Cayce
Clerk

No. 16-60604
CONSOLIDATED WITH
No. 21-60083

BP America, Incorporated; BP Corporation North America, Incorporated; BP America Production Company; BP Energy Company,

*Petitioners*,

*versus*

Federal Energy Regulatory Commission,

*Respondent*.

Petitions for Review of Orders of the
Federal Energy Regulatory Commission
Agency Nos. IN13-15-000, IN13-15-001, IN13-15-002

Before Jolly, Willett, and Oldham, *Circuit Judges*.

E. Grady Jolly, *Circuit Judge*:

Hurricane Ike made landfall over southeastern Texas on September 13, 2008. Although more than a decade has elapsed since the hurricane's passage, there yet remains some legal rubble for this court to clear.

No. 16-60604
c/w No. 21-60083

The Federal Energy Regulatory Commission (FERC) has brought this enforcement action against BP, alleging the company capitalized on the hurricane-induced chaos in commodities markets by devising a scheme to manipulate the market for natural gas.[1] Now, years later, BP seeks judicial review of FERC's order finding that BP engaged in market manipulation and imposing a $20 million civil penalty.

BP makes a bevy of arguments as to why FERC's order should be overturned, but all are meritless save one. Contrary to FERC's position, we hold that the Commission has jurisdiction only over transactions in interstate natural gas directly regulated by the Natural Gas Act (NGA). Specifically, we reject FERC's broader theory that its authority to address market manipulation extends to any natural gas transaction which affects the price of a transaction under the NGA. Otherwise, however, we uphold the Commission's order. Nevertheless, because FERC predicated its penalty assessment on its erroneous position that it had jurisdiction over all (and not just some) of BP's transactions, we must remand for reassessment of the penalty in the light of our jurisdictional holding. Thus, we GRANT in part and DENY in part BP's petition for review and REMAND to the agency for reassessment of the penalty.

**I**

**A**

To understand BP's scheme, some background on the natural gas industry is necessary. In addition to producing and selling their own oil and gas, participants in the natural gas market are permitted to engage in a variety of trades. In general, traders may make either "physical" or "financial"

---

[1] In reality, FERC brought its enforcement action against various BP-related entities, but we refer to these entities collectively as BP.

transactions. Physical trading involves the purchase or sale of actual natural gas, which must then be physically delivered from one party to another. Financial trades, on the other hand, are more in the nature of bets on the future price of gas; a financial transaction can be settled in cash without the need for any natural gas to actually change hands.

Shortly before Hurricane Ike arrived, traders on BP's Texas team had amassed a significant financial position known as a "spread." The value of this spread position was determined by the difference in natural gas prices at Henry Hub, a major natural gas market in Louisiana frequently used as a national benchmark, and Houston Ship Channel (HSC), a gas hub in Houston. When gas prices at Henry Hub were higher than those at HSC, BP's financial position became more valuable; the greater the difference, the more money BP stood to make.

When the hurricane hit, natural gas prices at HSC plummeted, causing BP to realize a sizeable profit. And amidst the tumult in the market, BP spied an opportunity; the company would make millions more if the price differential between HSC and Henry Hub persisted after the hurricane became history. According to FERC, BP capitalized on this opportunity by engaging in a glut of physical gas sales at HSC, intending to depress the prices on which the value of its financial position depended. BP's task was eased by the fact that it did not need to cause a sudden spike or dip in prices—a change which would have been easily detected by regulators—but only needed to delay the market's return to normal following the hurricane.

Central to BP's plan was the Houston Pipeline (HPL). The HPL connects HSC to Katy, another natural gas hub approximately thirty miles away. BP had purchased the right to transport a certain amount of natural gas on the HPL per day in order to satisfy its various business needs, but the pipeline was generally underutilized. BP thus allowed its Texas trading desk

to engage in arbitrage using the HPL; when there was a price difference between Katy and HSC, traders could transport gas accordingly between the two to make a profit while incurring only minor transportation costs. According to FERC, however, BP traders effectively abandoned their arbitrage strategy after the hurricane, instead using the HPL to transport significant quantities of natural gas from Katy to HSC, thereby lowering prices at the latter. Although BP incurred some losses in its physical trading by buying at Katy and selling at HSC regardless of whether it was economical to do so, these losses were dwarfed by the increase in value to BP's financial position. Access to transportation capacity on the HPL was therefore essential to the BP traders' scheme.[2]

The Texas trading desk's machinations went undetected until November 5, 2008. On that day, Clayton Luskie, a junior member of the Texas team, was attending a BP assessment program designed to determine whether aspiring traders were qualified for advancement in the company. While there, Luskie described the team's trading strategy to a member of BP's senior management, who became concerned that what Luskie had described "could be perceived as market manipulation." Alarmed, Luskie called Gradyn Comfort, a senior member of the Texas team and primary trader in charge of transactions at Katy and HSC. Because Luskie called Comfort at his trading desk, BP recorded the call, which is laid out in pertinent part below:

> LUSKIE: So I was telling [the senior BP executive] how we, you know, what we are doing at Ship Channel this month. And you know, he just started asking me about, you know, what,

---

[2] Although BP theoretically could have depressed prices without the HPL by simply buying large quantities of natural gas at HSC and then selling the same gas at lower prices, such a strategy would have been both easier to detect and far more costly.

kind of what we do and strategy and what not. And I was telling him about our HPL transport. And the way I explained it was not very good. And I came off sounding like we either transport or don't transport solely on the—kind of how we think it's going to affect the index and help our paper position. Which as I was explaining, I realized that's not right and that's the exact same thing that we're sort of accusing [a rival company] of currently. So how would you explain our dealings on HPL and with our paper position that don't make it sound like we're—

COMFORT: [Interposing] Clayton, Clayton—

LUSKIE: —manipulating the index.

COMFORT: Clayton.

LUSKIE: Yeah.

COMFORT: I think . . .

[Fifteen second pause]

COMFORT: Most of the time we ship economically.

LUSKIE: Right.

COMFORT: And the—

LUSKIE: [Interposing] I mean, it's just that we're not—

COMFORT: [Interposing] Clayton, Clayton.

LUSKIE: Yeah.

[Ten second pause]

COMFORT: You know, the—there's times we can't unwind all of our positions, but most of the time we tend to ship economically.

LUSKIE: Right.

COMFORT: Okay?

LUSKIE: Is it just that we're not—

COMFORT: [Interposing] Clayton.

No. 16-60604
c/w No. 21-60083

[Fifteen second pause]

COMFORT: And then . . . the aspects that go into cash I think are multiple. And . . .

[Fifteen second pause]

COMFORT: Just give me a second here, okay?

LUSKIE: Yeah.

[Pause]

LUSKIE: Hey, I tell you what, I need to actually, I need to run.

COMFORT: Yeah.

LUSKIE: Can I call you back?

COMFORT: Yeah, that would be a good idea.

LUSKIE: Okay.

COMFORT: Okay, thanks.

Despite claiming that that he "need[ed] to run," Luskie called Comfort back on Comfort's unrecorded cell phone less than one minute later. Comfort did not answer but returned the call two minutes later. Comfort and Luskie then had two unrecorded cell phone conversations lasting nine and ten minutes, respectively. Neither party was able to recall with specificity what was discussed during those phone conversations. In the last such conversation, however, Luskie and Comfort decided to report the initial, recorded phone conversation to BP's internal compliance team, which led FERC to initiate an investigation and which culminated in this enforcement proceeding.[3]

---

[3] FERC suggests that Luskie and Comfort reported the phone call because Luskie had already let slip revealing statements to a staff member of the independent monitor installed pursuant to a settlement with the Commodity Futures Trading Commission (CFTC), meaning that the pair knew regulatory scrutiny was imminent. The record before us, however, does not indicate what precisely Luskie revealed and does not unambiguously establish why Luskie and Comfort decided to disclose the phone call.

No. 16-60604
c/w No. 21-60083

**B**

Following several years of discovery and administrative proceedings, FERC issued its decision. *See BP Am., Inc.*, 156 FERC 61,031 (2016). In its decision, the Commission compared BP's natural gas trades during the Investigative Period—from September 18 to November 30, 2008—to its trading during the prior portion of 2008. FERC found that, following Hurricane Ike, BP changed its trading behavior at HSC by selling more natural gas, selling earlier in the day, selling at lower prices, and transporting more gas from Katy to HSC even when doing so was unprofitable. Viewing these changes together with the phone calls already discussed, FERC concluded that BP had engaged in market manipulation and ordered BP to pay a civil penalty of approximately $20 million. BP petitioned this court for review of FERC's order but agreed to stay the case pending the Commission's decision on BP's request for rehearing. In December 2020, FERC issued its order on rehearing, which modified portions of FERC's jurisdictional holdings but otherwise upheld its previous decision and penalty. *See BP Am., Inc.*, 173 FERC 61,239 (2020). BP brought another petition for review, which was consolidated with the previous case. These petitions are now properly before us and are ripe for our review.[4]

**II**

We review FERC's order under the standards established by the Administrative Procedure Act, 5 U.S.C. § 706. We are required to "hold unlawful and set aside agency action" which is "in excess of statutory jurisdiction" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*

---

[4] We have jurisdiction under 15 U.S.C. § 717r(b), which provides for direct review of FERC's orders in the circuit courts.

The agency's factual findings and conclusions will be upheld unless they are unsupported by substantial evidence. *Id.*; *see also* 15 U.S.C. § 717r(b). Substantial evidence is less than a preponderance of the evidence, but more than a scintilla. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002) (quotation marks omitted) (citing *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000)). In reviewing for substantial evidence, we do not substitute our own judgment for that of the agency. *Id.* Instead, we ask only whether the agency's actions were supported by "such relevant evidence as a reasonable mind might accept as adequate to support [its] conclusion[s]." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

### III

BP raises a number of issues to challenge FERC's order. First, BP argues that FERC did not have jurisdiction over its conduct because (1) FERC's jurisdiction extends only to interstate activity and (2) none of the transactions at issue were transactions in interstate gas regulated under the Natural Gas Act. Second, BP asserts that it did not engage in market manipulation and that FERC's conclusion to the contrary was arbitrary, capricious, and unsupported by substantial evidence. Third, BP contends that, even if it did engage in market manipulation, various errors in FERC's penalty process improperly inflated the fine imposed. Fourth, BP claims that FERC contravened the Administrative Procedure Act by intermingling its investigatory and adjudicatory functions. Finally, BP argues that the Commission's enforcement action is barred by the statute of limitations. We address these arguments seriatim.

### A

We begin by addressing whether FERC had jurisdiction over the allegedly manipulative transactions.

No. 16-60604
c/w No. 21-60083

**1**

The Natural Gas Act forms the cornerstone of FERC's regulatory power over the natural gas market. The foundational principle limiting that power is found in section 1(b) of the Act, which provides that:

> The provisions of [the NGA] *shall apply* to the transportation of natural gas in *interstate* commerce, to the sale in *interstate* commerce of natural gas for resale . . . and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but *shall not apply* to any other transportation or sale of natural gas or to the local distribution of natural gas . . . or to the production or gathering of natural gas.

15 U.S.C. § 717(b) (emphasis added). In enacting this provision, "Congress carefully divided up regulatory power over the natural gas industry" and declined to provide for wholesale federal regulation "to the limit of constitutional power." *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 510 (1989). Instead, the NGA grants FERC jurisdiction over transactions in interstate natural gas but denies jurisdiction over production and purely intrastate activity. 15 U.S.C. § 717(b).

This statutory scheme, as originally enacted, eventually resulted in a fragmented natural gas market, with much gas sequestered away in disparate intrastate markets and unable to cross state lines without being subjected to NGA regulations. *Associated Gas Distribs. v. FERC*, 899 F.2d 1250, 1255 (D.C. Cir. 1990). Congress responded by passing the Natural Gas Policy Act (NGPA). *Id.* The NGPA permitted interstate pipelines to transport gas "on behalf of" intrastate pipelines without subjecting the intrastate pipeline or other downstream recipients of the gas to the full ambit of NGA regulations, thus helping to integrate the interstate and intrastate markets. 15 U.S.C. § 3371; *Associated Gas*, 899 F.2d at 1255–56.

No. 16-60604
c/w No. 21-60083

Finally, in response to widespread reports of price manipulation in western energy markets, Congress passed the Energy Policy Act of 2005. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 381–82 (2015). Among other provisions, the Act amended the NGA by adding section 4A, which contains the anti-manipulation provision forming the basis of this case. Energy Policy Act of 2005, Pub. L. No. 109–58, sec. 315, § 4A, 119 Stat. 594, 691 (codified at 15 U.S.C. § 717c-1). Section 4A provides:

> It shall be unlawful for *any entity*, directly or indirectly, to use or employ, *in connection with* the purchase or sale of natural gas or the purchase or sale of transportation services *subject to the jurisdiction of the Commission*, any manipulative or deceptive device or contrivance (as those terms are used in [the Securities Exchange Act of 1934]) in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers.

15 U.S.C. § 717c-1 (emphasis added). With these statutes set out as the backdrop, we turn to the Commission's jurisdictional claims.

*2*

FERC does not contend that all of the transactions that were part of BP's manipulative scheme were interstate transactions directly subject to the NGA. Instead, the Commission argues that the anti-manipulation provision creates a new and independent source of jurisdiction for FERC to spread its wings. Pointing out that the statute above forbids manipulation by "any entity" "in connection with" a jurisdictional transaction, FERC argues that it has jurisdiction over *any* natural gas transaction that is part of manipulative scheme, so long as that scheme affects the price of an NGA-jurisdictional transaction. 15 U.S.C. § 717c-1. In other words, FERC asserts that it has jurisdiction over otherwise non-jurisdictional intrastate transactions if those transactions manipulate the price of interstate gas bought and sold under the

NGA. But as earlier set forth, the NGA clearly forbids FERC from exercising jurisdiction over intrastate transactions.

**i**

We first observe that, in interpreting statutes, it is seldom appropriate to seize on single words or phrases; instead, statutory interpretation requires consideration of the statutory scheme as an integrated whole. Context provided by surrounding language or statutory provisions can illuminate the meaning of an otherwise cryptic passage. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("[A] reviewing court should not confine itself to examining a particular statutory provision in isolation."). Our first look is therefore to section 1(b) of the NGA, which establishes a basic dichotomy: FERC is given power over "the transportation [or sale] of natural gas in interstate commerce," but the provisions of the NGA "shall not apply to any other transportation or sale of natural gas," including intrastate transportation and sales. 15 U.S.C. § 717(b). The statute thus clearly delineates between interstate natural gas transactions, which are subject to the NGA, and intrastate transactions, which are not.

**ii**

Nevertheless, FERC argues that this long-established partition between intrastate and interstate transactions was nullified for purposes of the anti-manipulation rule. More specifically, FERC argues that BP's scheme—even if conducted using only intrastate trades—was, in the words of the anti-manipulation provision, "in connection with" interstate, NGA transactions because it affected the price of those transactions.[5] 15 U.S.C.

---

[5] To reiterate, the anti-manipulation provision makes it "unlawful for any entity, directly or indirectly, to use or employ, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the

§ 717c-1. We are not satisfied, however, that the single statutory phrase "in connection with" can bear the weight FERC would place upon it; considering the explicit division drawn by the statute between interstate and intrastate transactions, it is plain to us that "in connection with" does not mean any connection whatsoever, regardless of how indirect or tenuous. To hold otherwise would be to hold that Congress intended for a subtle gloss of these three words to entirely upend its carefully defined limitations on FERC's jurisdiction. In short, such a reading is not plausible. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (citing *MCI Telecomms. Corp. v. Am. Tele. & Tel. Co.*, 512 U.S. 218, 231 (1994); *Brown & Williamson*, 529 U.S. at 159–60 ("Congress[] . . . does not, one might say, hide elephants in mouseholes.")).

### iii

Precedent confirms our understanding of the text. In *Texas Pipeline Ass'n v. FERC*, 661 F.3d 258 (5th Cir. 2011), we considered a similar jurisdictional issue. In that case, FERC asserted that an amendment to the NGA had given it a new and separate "transparency authority" not constrained by the jurisdictional limitations of section 1(b). *Id.* at 261–62. The Commission pointed to new statutory language empowering it to gather pricing information from "any market participant," arguing that it could therefore demand price data not only from interstate pipelines, but also from wholly intrastate pipelines. *Id.* at 261 (quoting 15 U.S.C. § 717t-2(a)(3)(A)). Our court rejected this position, reasoning that the statute could only be interpreted as such "if [the statutory language relied on by FERC] floated solitary and free in the U.S. Code." *Id.* But we could not read the relevant

---

Commission, any manipulative or deceptive device or contrivance . . . in contravention of" FERC's regulations. 15 U.S.C. § 717c-1.

provision in isolation, thereby ignoring the crucial context provided by section 1(b) and its jurisdictional distinction between interstate and intrastate activity. *Id.* at 261–62. Thus, our review of the NGA's text and history "confirm[ed] our conclusion that Congress did not intend to regulate 'the entire natural-gas field to the limit of constitutional power' but chose instead to leave regulation of certain entities, including intrastate transactions and pipelines, to the states." *Id.* at 263 (footnote omitted) (quoting *Nw. Cent. Pipeline*, 489 U.S. at 510). The same reasoning directs us to the same conclusion in this case.

Furthermore, we have previously noted that "where Congress *has* decided to expand FERC's jurisdiction, it has done so explicitly and unambiguously." *Id.* at 263–64. In both *Texas Pipeline* and this case, the new rule that purportedly expanded FERC's jurisdiction was added to the NGA by the Energy Policy Act of 2005. *Id.*; § 4A, 119 Stat. at 691. In that same act, however, Congress explicitly expanded FERC's jurisdiction by modifying section 1(b) to include importation and exportation. *Tex. Pipeline*, 661 F.3d at 263–64. In sum, we join the *Texas Pipeline* court's conclusion that where Congress seeks to modify the Commission's jurisdiction, it does so directly by amending the portion of the statute explicitly addressing jurisdiction rather than by relying on a subtle reading of an otherwise non-jurisdictional provision.

Finally, the Supreme Court has indicated that language similar to that found in the anti-manipulation provision incorporates the NGA's jurisdictional provisions. In *Oneok, Inc. v. Learjet, Inc.*, the Court examined a provision authorizing FERC to adjust "any rate, charge, or classification . . . collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of" the Commission. *Oneok*, 575 U.S. at 378 (emphasis removed) (quoting 15 U.S.C. § 717d(a)). The Court determined that the phrase "subject to the jurisdiction of the

13

Commission" referred to the jurisdictional distinction between interstate and intrastate transactions. *Id.* at 378–79. The anti-manipulation statute contains the same "subject to the jurisdiction of the Commission" phrase. 15 U.S.C. § 717c-1. Because similar statutory language is ordinarily interpreted to have a similar meaning, *Nijhawan v. Holder*, 557 U.S. 29, 39 (2009) (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005)), the Court's decision in *Oneok* supports the conclusion that the anti-manipulation rule does not depart from the NGA's general jurisdictional principles.

Thus, our textual analysis and relevant precedent compel the conclusion that the Commission cannot exercise its jurisdiction merely because a manipulative scheme may affect the prices of interstate natural gas trades.[6]

**3**

Although we reject its broader jurisdictional claim, FERC asserts as an alternative basis for its jurisdiction that several of BP's natural gas sales made as part of its manipulative scheme were, in fact, transactions in interstate gas directly regulated under the NGA. Although FERC does not assert that any of BP's transactions directly involved the purchase or transportation of natural gas across state lines, the Commission convincingly

---

[6] An agency's interpretation of its governing statute, when ambiguous, implicates the two-step *Chevron* framework. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984) (describing the steps when reviewing an agency's construction of a statute it administers as (1) determining if Congress has spoken directly on the issue and (2) if Congress has not spoken directly on the issue, determining the permissibility of the agency's construction). But there is no need to go through such steps when a statute unambiguously forecloses an agency's position. *See Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1572 (2017) (finding "no need" to determine whether an agency was entitled to deference under *Chevron* when "the statute, read in context, unambiguously foreclose[d] the [agency's] interpretation"); *see also Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896 (2022). That is to say, in such a case, we simply follow the statutory command.

points to its long-held position—which BP does not challenge here—that once gas is sold or transported in interstate commerce, it remains interstate gas thereafter. *See Westar Transmission Co.*, 43 FERC 61,050, 61,141 n.12 (1988). Stated differently, once gas is sold or transported in a transaction subject to NGA regulations, all subsequent transactions, whether interstate or intrastate, are controlled by the NGA. *Id.* FERC claims that eighteen of BP's allegedly manipulative sales used natural gas that had been transported in interstate commerce under the NGA.[7] Specifically, the Commission points out that, in these eighteen transactions, the gas sold by BP had previously been transported under a contract which stated in its title that it was made "UNDER SUBPART G OF PART 284 OF THE FERC'S REGULATIONS."[8] Subpart G of Part 284 implements section 7 of the NGA, meaning that a contract under the referenced regulations is subject to the NGA. *See* 18 C.F.R. § 284.221(a).

BP does not dispute that the natural gas it sold had been transported under a contract with the above-quoted language. Instead, BP argues that, despite the language on its face, the contract was actually under section 311 of the NGPA. As earlier discussed, the NGPA exempts from FERC's NGA jurisdiction interstate transportation performed "on behalf of" an intrastate pipeline. 15 U.S.C. §§ 3431(a), 3371(a). Thus, if the contract was governed by the NGPA, FERC does not have jurisdiction. If, on the other hand, the

---

[7] The parties discuss only one particular transaction and treat it as representative of the eighteen. We will therefore do the same.

[8] We reject BP's argument that it was an abuse of discretion for the administrative law judge to allow evidence of most of these transactions to be introduced for the first time on rebuttal. As FERC points out, the Commission's witness gave evidence of some of the transactions on direct examination and specifically stated that the ongoing discovery process might reveal further transactions. Moreover, because testimony was given in written form, BP had ample time and opportunity to cross-examine FERC's witness even after the rebuttal testimony.

No. 16-60604
c/w No. 21-60083

contract was made pursuant to the NGA, FERC does have jurisdiction. In support of its claim that the NGPA controls, BP points to a spreadsheet produced in discovery by one of the parties to the upstream contract; this spreadsheet indicates that the pertinent contract is a section 311 contract under the NGPA. BP also claims that the disputed contracts reference NGA regulations simply because the pipeline which provided the contractual form did not have a different template for NGPA transactions.

We review for substantial evidence FERC's finding that the contracts in the eighteen disputed transactions were governed by the NGA.[9] On this record, we can but conclude that the Commission's finding that the NGA controlled was supported by substantial evidence. One after-the-fact, undetailed spreadsheet containing little more than an unexplained assertion that the contract was under the NGPA does not overcome the unambiguous language on the face of the contract to the contrary. And while BP asserts that the drafter of the contract simply did not have a template for NGPA transactions, BP points to no evidence of this in the record before us other than the company's own assertions of the same before the Commission. Even assuming the accuracy of BP's representation, FERC reasonably concluded that, had the parties intended an NGPA contract, they could have created a new template or otherwise modified the contractual language. Substantial

---

[9] Both BP and FERC evidently accept, without discussion, that the contractual parties' identification of the governing regulations—whether in the contract's text or in a spreadsheet—is relevant to whether the contract is governed by the NGA or NGPA. Although counsel for BP contended at oral argument that if certain statutory conditions are satisfied, the NGPA automatically exempts a transaction from the NGA, BP did not make any such argument in its initial or even in its reply brief. Issues raised only at oral argument are waived. *Zuccarello v. Exxon Corp.*, 756 F.2d 402, 407–08 (5th Cir. 1985). We therefore assume, for purposes of this case, that the spreadsheet and contractual language are pertinent to whether the NGA or NGPA controls. We express no opinion, however, as to whether in general a contractual party's identification of the contract's governing regulations can ever be effective.

No. 16-60604
c/w No. 21-60083

evidence does not require even a preponderance of the evidence, but instead demands that the agency produce "such relevant evidence as a reasonable mind might accept as adequate." *Consolo*, 383 U.S. at 620 (quoting *Consol. Edison*, 305 U.S. at 229) (quotation marks omitted). FERC has carried its burden here. It was reasonable to take the language in the contract at face value. The Commission thus had substantial evidence to conclude that the disputed natural gas was transported under an NGA contract, meaning that FERC had jurisdiction over the eighteen later transactions in which BP sold the same gas. We therefore uphold FERC's assertion of jurisdiction over those eighteen of BP's sales.[10]

## B

We move on to consider FERC's finding that BP engaged in market manipulation. Although BP gives various reasons for us to find that FERC acted arbitrarily and capriciously or without the support of substantial evidence, we find that BP's contentions ultimately amount to disagreements with FERC's permissible interpretations of the evidence and reasonable resolution of conflicting expert testimony. We address BP's principal arguments in turn.[11]

---

[10] We reject, however, FERC's argument that it has jurisdiction over thirty-six additional specific transactions for which it could not show an upstream NGA contract. FERC asserts that the eighteen transactions over which it does have jurisdiction render BP a regulated "natural-gas company" under the NGA, *see* 15 U.S.C. § 717a(6), thereby subjecting the remaining thirty-six transactions to regulation even if they would otherwise be shielded by the NGPA. This position is plainly foreclosed by the NGPA's text, which provides that "[f]or purposes of the [NGA], the term 'natural-gas company' . . . shall not include any person by reason of, or with respect to, any transportation of natural gas if [the NGA and FERC's jurisdiction thereunder] do not apply to such transportation by reason of [the NGPA]." 15 U.S.C. § 3431(a)(2)(B); *see also id.* § 3431(a)(1)(C) (nearly identical provision for sales).

[11] We reject at the outset BP's argument that FERC failed to adequately define or provide notice of what constitutes market manipulation. BP is correct that agencies must

No. 16-60604
c/w No. 21-60083

First, BP claims that FERC's selection of the Pre-Investigative Period failed to account for seasonal changes in the natural gas market.[12] Yet FERC's witnesses testified that some trading behaviors, such as transportation between Katy and HSC, depended not on seasonal factors but solely on price differences between the two hubs. Moreover, FERC tried using alternative comparator periods and found essentially the same results: during the Investigative Period, BP sold more, sold earlier, and transported more gas to HSC. We therefore cannot accept BP's seasonality arguments.

Next, BP challenges FERC's findings concerning its increased sales at HSC. Though BP does not deny that, by volume, it sold more natural gas at HSC during the Investigative Period, it argues that this fact is the blameless

---

generally give regulated parties "fair notice of the wrong to be avoided." *Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 718 F.3d 488, 493 (5th Cir. 2013). But a statute forbidding "any manipulative . . . device or contrivance" "in connection with the purchase or sale of natural gas" provides more than adequate notice that the conduct of which BP is accused—that is, engaging in repeated natural gas sales with the objective of manipulating prices—is prohibited. 15 U.S.C. § 717c-1. Moreover, the anti-manipulation provision and implementing regulations are modeled after section 10(b) of the Securities Exchange Act and SEC Rule 10b-5, respectively. *Compare* 15 U.S.C. § 717c-1, *and* 18 C.F.R. § 1c.1, *with* 15 U.S.C. § 78j(b), *and* 17 C.F.R. § 240.10b-5. Courts have interpreted these securities provisions broadly, mindful that fraud—like market manipulation—can take many different forms that cannot all be specifically articulated in advance. *See SEC v. Zandford*, 535 U.S. 813, 821 (2002) (quoting *Superintendent of Ins. Of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971)) (stating that § 10(b) "must be read flexibly, not technically and restrictively"). We therefore find that the arguably imprecise language of the anti-manipulation rule, and the many different factors FERC identified as indicative of a violation thereof, are not symptoms of a lack of notice or an inadequate decisional standard, but the natural consequence of the many ways in which market manipulation can manifest.

[12] To reiterate, the Investigative Period represents the period during which BP allegedly manipulated the market and spans from September 18 to November 30, 2008. The Pre-Investigative Period, which stretches from January 2 to September 10, 2008, serves as a comparator in FERC's efforts to identify changes in BP's trading activity following Hurricane Ike.

result of having more gas to sell under its monthly contracts.[13] As FERC found, however, BP changed its behavior during the Investigative Period by buying more gas at Katy under monthly contracts and reducing its obligations to deliver at HSC under such contracts. This behavior left BP with more gas on hand to sell at HSC under the daily contracts on which BP's financial position depended. BP is, we think, inculpated, rather than exonerated, by its attempted explanation. We thus detect nothing arbitrary or capricious in FERC's treatment of BP's increased sales.

BP further challenges FERC's conclusion that BP traded earlier in the day as part of its manipulative scheme. BP first states that there is no evidence early trades have any manipulative effect and goes on to argue that, in any event, its Investigative Period trades were no earlier than normal. The first contention is directly contradicted by the record; FERC's expert testified that early trades send pricing signals to other market participants and may affect other transactions throughout the day. As to the second contention, while BP's expert indicated that the company's transactions were not particularly early during the Investigative Period, FERC correctly points out that this result was reached only by combining sales and purchases. Disaggregating sales from purchases shows that BP was an early seller at HSC and early buyer at Katy. Given that FERC's core allegation of wrongdoing was that BP bought gas at Katy to sell and deflate prices at HSC, we find it reasonable for the Commission to have accepted its own expert's testimony. *See La. Crawfish Producers Ass'n-W. v. Rowan*, 463 F.3d 352, 356 (5th Cir.

---

[13] The value of BP's financial positions depended solely on the price of gas under next-day, fixed price contracts—that is, one-time contracts for the delivery of natural gas the next day. BP was thus free to buy or sell gas under monthly contracts without affecting its paper position.

2006) ("[A]n agency may rely on its own experts, so long as they are qualified and express a reasonable opinion.").

BP also objects to FERC's transport analysis, which found that the company transported gas from Katy to HSC even when it was uneconomic to do so. More specifically, the analysis showed that there was a statistically significant relationship between BP's transport decisions and the price differential at Katy and HSC during the Pre-Investigative Period; BP became indifferent to this price spread, however, during the Investigative Period. BP says that FERC improperly used the end-of-day average prices at HSC and Katy, rather than intraday prices, pointing out that its traders could not make transport decisions during the trading day based on the end-of-day average price. But we think that FERC's choice of metric was reasonable, both because end-of-day prices tend to track intraday prices and because the Commission was comparing prices to the total flow of natural gas—a figure which itself represents the sum of transportation decisions throughout the trading day.

Finally, we cannot accept BP's argument that the Commission failed to establish intent to manipulate the market. FERC showed that BP changed its behavior by transporting more natural gas to HSC, selling more, and selling at a time calculated to maximally influence market prices. There is nothing arbitrary and capricious in FERC's technical analysis or reasoning. Furthermore, the suspicious nature of BP's trading patterns is accentuated by the interactions between Gradyn Comfort and Clayton Luskie. During a recorded phone conversation, Comfort repeatedly interrupted Luskie's line of inquiry, which cast doubt on the team's trading strategy, and took several extended pauses as he ineffectively cast about for a convincing answer. Luskie then terminated the call by saying that he "need[ed] to run" but called Comfort back on an unrecorded line almost immediately thereafter, and neither party could remember what was discussed in the subsequent phone

No. 16-60604
c/w No. 21-60083

conversations with specificity. It is certainly reasonable to conclude that Comfort had an awareness that his scheme was illicit and sought to prevent incriminating information from being revealed on a recorded call, and Luskie eventually realized this and endeavored to circumvent the recording. Given the incriminating call and the suspect details of BP's actual trading, FERC's finding of market manipulation is supported by substantial evidence. We therefore affirm FERC's finding that BP violated the anti-manipulation rule.[14]

## C

We now turn to the Commission's penalty assessment. The parties dispute whether FERC's penalty was arbitrary and capricious. But many of the issues pertinent to determining an appropriate penalty, such as the proper calculation of profits and market harm, are ill-suited to our resolution given our holding that FERC has jurisdiction only over some of BP's transactions. The appropriate course is therefore to remand to the Commission for reassessment of the penalty in the light of our jurisdictional holding. We will, however, address the penalty issues that are unaffected by our decision as to jurisdiction.[15]

---

[14] BP makes various other arguments which support or complement the specific contentions laid out above. After thoroughly reviewing the briefs and the record, however, we determine that BP's remaining arguments as to whether it manipulated the market are meritless.

[15] At the outset, BP asserts that it was arbitrary and capricious for FERC to find any anti-manipulation rule violations at all, arguing that the Commission improperly relied on net selling to establish violations and ignored BP's defense that its trading was often profitable. We reject BP's arguments because FERC relied on more than BP's status as a net seller and because profitable trading may nevertheless be manipulative.

21

No. 16-60604
c/w No. 21-60083

**1**

We cannot agree with BP that FERC improperly treated as binding, or retroactively applied, its advisory sentencing guidelines.[16] FERC explicitly acknowledged, when applying the guidelines, that they were advisory only; contrary to BP's assertions, that the agency acted consistent with its non-binding guidance does not prove that it misconstrued that guidance as carrying the force of law. Nor was it arbitrary or capricious for FERC, in its guideline calculations, to account for several settlements BP entered into before the guidelines were promulgated. By statute, FERC is required when imposing a penalty to "take into consideration the nature and seriousness of the violation and the efforts to remedy the violation." 15 U.S.C. § 717t-1(c). Thus, whether it punished BP under the guidelines or otherwise, the Commission was entitled to account for BP's past settlements because a history of wrongdoing worsens the "nature" and increases the "seriousness" of an offense. *Id.*

**2**

Nor did the Commission err by taking into account BP's violation of a settlement agreement with the Commodity Futures Trading Commission. BP argues, and FERC concedes, that only the CFTC can find a violation of the Commodity Exchange Act (CEA). But the settlement BP entered into with the CFTC prohibited BP from "directly or indirectly engaging in any conduct that violates [the CEA] including [m]anipulating or attempting to manipulate the price of any commodity in interstate commerce." It is thus BP's settlement agreement itself, and not FERC, that characterizes market

---

[16] The sentencing guidelines are a set of rules, issued by FERC in a non-binding policy statement, guiding the Commission's discretion in imposing a civil penalty. *See Revised Policy Statement on Penalty Guidelines*, 132 FERC 61,216 (2010).

manipulation as a violation of the CEA; FERC did not act unreasonably in considering the fact that BP had transgressed the settlement's straightforward proscription of manipulating prices.

**3**

Finally, FERC did not err in denying BP credit for its compliance program under the sentencing guidelines. Although BP did have a well-funded compliance program, which FERC initially found to be diligent and helpful, the Commission changed its view on learning of what it saw as several deficiencies in BP's program. Most notably, FERC found that BP's compliance systems failed to track traders' profit and loss or trading by location; that a manager in compliance told a senior BP official, before investigating, that he did not think the Texas team had done anything wrong; and that BP prematurely ended its internal investigation. Although, given BP's non-negligible compliance efforts, the agency could have come to another conclusion, we cannot say that it was arbitrary or capricious for FERC to deny BP credit for its compliance program under these circumstances.

**D**

BP's next major argument asserts that the Commission violated the APA's separation of functions rule by intermixing its investigatory and adjudicatory roles.[17] Specifically, BP contends that certain orders issued by

---

[17] FERC argues that the separation of functions issue is waived because it was not included in BP's brief on exceptions. But the regulatory provision on which FERC relies states that if a participant "does not object *to a part of an initial decision* in a brief on exceptions, any objections . . . *to that part of the initial decision* are waived." 18 C.F.R. § 385.711(d)(2) (emphasis added). The administrative law judge's initial decision did not address separation of functions arguments, so the cited regulation is inapplicable under its plain terms. To be sure, BP repeatedly raised and diligently pursued the issue as early as

No. 16-60604
c/w No. 21-60083

FERC support a finding that the agency violated the separation of functions rule. In considering this claim, we first examine what is required by the statute's text. The APA promotes neutrality in agency adjudication by commanding that:

> An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings.

5 U.S.C. § 554(d). We note that the statute, by its terms, prohibits only individuals who actually "engaged in the performance" of investigative functions "in a case" from participating in the adjudication "*in that or a factually related case*." *Id.* (emphasis added). In other words, the APA forbids individuals from taking part in both investigation and adjudication on the same case, but it does not require agency staff who investigated one case to abstain from adjudication in other, factually unrelated cases.

In arguing that FERC violated the principles set out above, BP points to several Commission orders. These orders implemented the separation of functions rule by forbidding members of FERC's Office of Enforcement from adjudicating BP's case. As BP notes, however, the orders exempted a handful of named individuals, thus allowing certain members of the Commission's investigatory staff to take part in adjudication.

As we have discussed, the APA does not prohibit all overlap between investigatory and adjudicatory roles in general; it only prohibits individuals from performing both functions *in the same case*. Although the individuals

---

2014—before the initial decision was even issued. Under these circumstances, the issue is therefore not waived.

named in FERC's orders were members of the Commission's investigatory office, BP offers no reason to believe that they did, in fact, work as investigators on BP's case. Instead, BP can offer only speculation to this effect. But courts considering separation of function challenges have generally required particularized allegations as to who committed a violation or how it occurred. *Air Prods. & Chems., Inc. v. FERC*, 650 F.2d 687, 710 (5th Cir. 1981) (discussing allegation adjudicator improperly considered *ex parte* information offered by agency investigators in a particular memorandum and at a particular meeting); *Gibson v. FTC*, 682 F.2d 554, 560 (5th Cir. 1982) (considering claim that administrative law judge was tainted by previous work as a staff attorney to an agency head); *Grolier, Inc. v. FTC*, 615 F.2d 1215, 1221 (9th Cir. 1980) (same as *Gibson* and collecting cases). The conjecture offered by BP here does not suffice.[18]

But BP complains that it was prevented from obtaining evidence pertinent to its separation of functions argument by FERC's denial of its request for privilege logs, which it contends would have allowed it to evaluate FERC's compliance with the separation of functions rule. BP, however, has failed to show that it was entitled to such privilege logs. There is no indication that BP took any of the more modest investigatory steps that would have been appropriate before seeking voluminous discovery from FERC. *See, e.g.*, *Grolier*, 615 F.2d at 1222 (indicating that sworn statements from relevant agency figures may resolve a separation of functions issue and that such

---

[18] BP's assertion that members of the Commission's investigatory staff are tainted simply by being employees of FERC's Office of Enforcement and subject to its leaders' supervision is likewise unavailing. Absent evidence of improper influence, BP's claim is speculative. BP's argument is also in tension with the APA because it would effectively expand the prohibition on adjudication to FERC's entire investigatory staff. The statute's text, however, applies this prohibition only to individuals who investigated the particular case at issue or a factually related case. *See* 5 U.S.C. § 554(d).

No. 16-60604
c/w No. 21-60083

statements, if uncontradicted, may be a basis to deny further discovery). This court has previously denied expansive requests to sift through an agency's records in search of an APA violation, particularly where there was "nothing in the material brought to this court's attention to suggest" impropriety on the part of the agency. *Air Prods.*, 650 F.2d at 710 n.37. BP's concerns, based on speculation and devoid of any concrete facts plausibly suggesting that FERC intermixed its investigatory and adjudicatory functions, do not suffice "to overcome the 'presumption of honesty and integrity in those serving as adjudicators.'" *Id.* (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Thus, we reject BP's argument that FERC violated the separation of functions rule.[19]

## E

BP's final argument is that FERC's entire enforcement action must be dismissed because it is barred by the statute of limitations. FERC counters that this court does not have jurisdiction to consider the issue because BP failed timely to raise it before the agency. Although we must, of course, decide the jurisdictional question first, we briefly lay out the parties'

---

[19] BP also contends that FERC's regulation purportedly implementing the APA's separation of functions rule actually impermissibly allows agency investigators to adjudicate in the same case they investigated. *See* 18 C.F.R. § 385.2202 (implementing regulation). BP argues that the regulation allows FERC staff to fully participate in the investigation of a case, stop just before an order to show cause is issued, and then participate in the case's adjudication. Although we agree that the contested regulation is not the standard for pellucidity, we think that the better understanding of the regulation is that all staff who have participated or who are participating in the Commission's investigation are prohibited from taking part in a subsequent adjudication. Such a reading accords with how the regulation has been interpreted both by the Commission, *BP Am., Inc.*, 173 FERC 61,239, 62,540, and, more importantly, by this court, *Total Gas & Power N. Am., Inc. v. FERC*, 859 F.3d 325, 329 (5th Cir. 2017) (describing § 385.2202 as forbidding staff who "were involved" in the investigation from participating in adjudication).

26

positions on the merits of the statute of limitations question because doing so is helpful to our discussion of jurisdiction.

**1**

On the merits, both parties agree that the limitations period applicable in this case is provided by 28 U.S.C. § 2462. That statute states that:

> an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued.

*Id.* The parties further agree that this five-year limitations clock began ticking in September of 2008, when BP's alleged manipulative conduct began.

The parties disagree, however, as to whether, in the race to the deadline, FERC broke the ribbon in time. FERC contends that its enforcement proceeding began in August of 2013—just within the five-year limitations period—when it issued its order to show cause. BP, on the other hand, argues that FERC's action was untimely because the Commission's order to show cause cannot initiate a "proceeding" within the meaning of the statute of limitations. *Id.* BP argues that a proceeding requires an adversarial adjudication, meaning that there must be motions, hearings, depositions, the taking of evidence, and the like. *See FERC v. Barclays Bank PLC*, No. 2:13-cv-2093, 2017 U.S. Dist. LEXIS 161414, at *28 (E.D. Cal. Sept. 29, 2017) (quoting *3M Co. (Minn Mining & Mfg.) v. Browner*, 17 F.3d 1453, 1456 (D.C. Cir. 1994)). According to BP, because an order to show cause, in and of itself, is not accompanied by such hearings or motions, said order does not begin a proceeding. Thus, says BP, it was instead some unidentified, later point in FERC's administrative process that officially initiated the "proceeding"

No. 16-60604
c/w No. 21-60083

within the meaning of 28 U.S.C. § 2462.[20] Because FERC's order to show cause was the only part of its administrative process that came within five years of the action accruing in September of 2008, BP concludes that FERC's action was untimely and must be dismissed under the statute of limitations.

**2**

Having set the scene by laying out the parties' substantive positions, we now proceed to decide whether we have jurisdiction to consider the statute of limitations. Our jurisdiction is controlled by 15 U.S.C. § 717r(b), which provides that "[n]o objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." *See also NICOR Expl. Co. v. FERC*, 50 F.3d 1341, 1346–47 (5th Cir. 1995) (stating that requirement to include issue in application for rehearing is jurisdictional). Under the plain terms of this statute, then, we have jurisdiction to consider the statute of limitations only if BP raised it in its application for rehearing or if BP had reasonable ground for its failure thusly to raise the matter.

It is undisputed that BP did not address the statute of limitations in its application for rehearing in 2016. Instead, BP first raised the issue more than a year later in a 2017 motion to reopen. Thus, BP must show that it had "reasonable ground" for its failure timely to assert the matter at rehearing. 15 U.S.C. § 717r(b).

BP argues that it did have reasonable ground for its delay, pointing to two cases, *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), and *FERC v. Barclays Bank PLC*, 2017 U.S. Dist. LEXIS 161414. According to BP, these cases, which

---

[20] BP does not specifically state what order or hearing within FERC's enforcement process it believes does start a proceeding for the purposes of the statute of limitations.

were issued after the application for rehearing had been filed, changed the law to support BP's substantive position—which we have already laid out above—on the statute of limitations. Because these allegedly crucial cases issued only after the application for rehearing had been filed, BP contends that it had reasonable ground for failing to raise the issue at rehearing.

But even assuming, for the sake of argument, that subsequently issued decisions can provide reasonable ground for failing to raise an issue at rehearing, BP's cases simply did not change the law in the manner suggested by BP. To reiterate, the core dispute between the parties on the merits—and the issue that BP claims these two cases decided in its favor—is whether the order to show cause constitutes the beginning of a "proceeding" within the meaning of the statute of limitations. *See* 28 U.S.C. § 2462. We emphasize that we are not actually considering or deciding this merits question, but are instead asking only whether BP's cited cases support its position. If BP's cases do not support its position that the statute of limitations blocks FERC's enforcement action, then they certainly cannot provide reasonable ground for making that argument in an untimely fashion.

We thus turn to address the two cited cases. *Kokesh*, for its part, did not even consider the issues involved in this case, such as the meaning of "proceeding" or the effect of an order to show cause. Instead, the Supreme Court in *Kokesh* held only that the limitations period in 28 U.S.C. § 2462 applies to disgorgement actions. 137 S. Ct. at 1639; *see id.* at 1642 n.3 ("The sole question presented in this case is whether disgorgement . . . is subject to § 2462's limitations period."). To be sure, the phrase "order to show cause" does not even appear in the decision. 137 S. Ct. 1635. Stated differently, *Kokesh* had nothing to do with the actual statute of limitations questions disputed by FERC and BP. BP's invocation of *Kokesh* appears, quite frankly, to be an effort to cloak BP's more relevant case—a lone unpublished decision from an out-of-circuit district court—with the suggestion of Supreme Court

authority. But whether acting in concert with another case or standing alone, *Kokesh* does not support BP's position on the merits. It thus does not supply reasonable ground for BP's failure to raise the statute of limitations earlier.[21]

We now turn to the unpublished California district court case that supposedly turned the law in new and unexpected directions. In *Barclays*, the district court found that a "proceeding" involves certain hallmarks of judicial procedure—in a proceeding, "motions and affidavits are filed, depositions are taken, other discovery pursued, a hearing is held," and so forth. *Barclays*, 2017 U.S. Dist. LEXIS 161414, at *28, *33 (quoting *3M*, F.3d at 1456). *Barclays* is at least within the right zip code, in that it considers the meaning of a "proceeding" under 28 U.S.C. § 2462.  But, one unpublished decision from an out-of-circuit district court cannot change the law in a manner sufficient to excuse BP's untimeliness.

Moreover, though *Kokesh* and *Barclays* may well have provided BP with untimely inspiration—or perhaps a reminder of a missed opportunity—neither decision was necessary for BP to make its case. BP's core argument is one of statutory interpretation concerning the meaning of a "proceeding" for the purposes of 28 U.S.C. § 2462. But no favorable judicial decision is a *sine qua non* to advocate a possible interpretation of a helpful statute. And the significant passage of time throughout the life of the case—about five years of investigation and another three of administrative procedure before the application for rehearing—should have alerted BP to the need to look into

---

[21] We also note that, whatever the case may be as to disgorgement, it has long been established that civil fines are subject to section 2462's limitations period. *Kokesh*, 137 S. Ct. at 1640–41 (citing *Gabelli v. SEC*, 568 U.S. 442, 454 (2013)). Thus, *Kokesh* is also of no help to BP because, assuming *arguendo* that BP did not know it needed to raise the statute of limitations as to disgorgement, BP still had cause to know that it should raise the matter in response to the more than $20 million in civil fines imposed by FERC.

whether it might have a statute of limitations claim. Given these circumstances, BP's delay in raising the issue was not reasonable.

In sum, an examination of BP's proffered cases reveals that neither constitutes an intervening change in law which could excuse BP's untimeliness. And, in any event, BP could have reasonably made the same arguments even in the absence of the cited cases. We thus conclude that BP did not have "reasonable ground" for its delay in raising the statute of limitations. 15 U.S.C. § 717r(b). Accordingly, we have no jurisdiction over the issue, and we will not consider it.[22]

## IV

In this appeal, we have rejected FERC's expansive assertion that it has jurisdiction over any manipulative trade affecting the price of an NGA transaction. We have, however, reaffirmed the Commission's authority over transactions directly involving natural gas in interstate commerce under the NGA. We have further determined that there was substantial evidence to support FERC's finding that BP manipulated the market for natural gas. We have found that FERC's reasoning in imposing a penalty was not arbitrary and capricious, though we have concluded that FERC's reliance on an erroneous understanding of its own jurisdiction necessitates a remand for recalculation of the penalty.[23] Finally, we have held that neither separation of

---

[22] BP also contends that we can consider the statute of limitations issue because it would be a manifest injustice to do otherwise. *See Tenneco Expl., Ltd. v. FERC*, 649 F.2d 376, 378 n.1 (5th Cir. 1981) (stating that court would consider issue because failing to do so would be manifestly unjust). We do not see manifest injustice, however, in declining to consider an issue that BP neglected for more than four years—from the inception of the case in 2013 until BP's motion to reopen in 2017.

[23] We express no opinion as to the proper disposition on remand of any issues not addressed by this decision.

No. 16-60604
c/w No. 21-60083

functions nor statute of limitations issues justify overturning the Commission's order.

Accordingly, BP's petition for review is GRANTED in part and DENIED in part, and the matter is REMANDED to the Federal Energy Regulatory Commission for reassessment of its penalty in the light of our jurisdictional holding.

Petition GRANTED in part; DENIED in part; REMANDED.